## Adoption of Imelda.[1]

No. 07-P-1520.

Essex. February 14, 2008. - August 14, 2008.

Present: Mills, Katzmann, & Vuono, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption. *Grandparent. Practice, Civil,* Findings by judge. *Minor,* Temporary custody. *Practice, Civil,* Continuance.

Discussion of the analysis involved in a decision to terminate parental rights. [360-361]

This court vacated a decree of the Juvenile Court dispensing with a mother's consent to the adoption of her three year old daughter, where the record did not clearly and convincingly establish the mother's unfitness, in that the evidence at trial cast doubt on several of the findings central to the judge's decision (that the mother had done nothing to address her substance abuse problems, that her whereabouts were unknown, and that she had failed to avoid an atmosphere of domestic violence) [361-363]; further, the judge's determination that the child's plan for adoption by the paternal grandmother was in the child's best interests could not stand, where the judge erroneously failed to make specific and detailed findings regarding domestic violence in the adoptive home and its effects on the child [364-365].

This court remanded to the Juvenile Court a care and protection matter to address the mother's current parental fitness and domestic violence in the adoptive home, directing that the child's mother be represented by counsel, and expressing concern that the mother had lacked representation at the best interests portion of the trial. [365-367]

Petition filed in the Essex County Division of the Juvenile Court Department on January 17, 2006.

The case was heard by *Sally F. Padden,* J.

*Lisa J. Campbell* for the mother.

*Richard A. Salcedo* for Department of Children and Families.

*Harriet Schechter* for the child.

Vuono, J. The mother appeals from a decree of the Juvenile

---

[1] A pseudonym.

Court dispensing with her consent to the adoption of her three year old daughter, Imelda. She argues that the evidence does not clearly and convincingly establish that she is currently unfit. She also claims that the judge's subsidiary findings demonstrate that the judge did not engage in an "even handed review of the evidence" and that the judge erroneously failed to make specific and detailed findings regarding domestic violence in the adoptive home.

We note at the outset that this case is unusual because, ten months after the Department of Children and Families (DCF)[2] filed its care and protection petition, the child, rather than DCF, sought to terminate parental rights.[3] Imelda maintains that it is in her best interests to be adopted by her paternal grandmother, with whom she has been living since February of 2006. After careful review of the judge's findings and the record, we conclude that the decree dispensing with the mother's consent to the adoption must be vacated.

*Facts.* We summarize the material facts from the judge's findings that are supported by the evidence, supplemented by undisputed evidence from the trial exhibits relied on by the judge.[4] Imelda was born on November 21, 2003. Her parents had become romantically involved when the mother was fourteen and the father was sixteen. At the time of Imelda's birth, the mother was seventeen and the father was nineteen. Imelda's paternal grandmother obtained legal guardianship of Imelda's mother after she became pregnant, and transported her to her prenatal doctors' appointments.[5] During the pregnancy, the father was incarcerated on drug-related charges; he began living with the mother after his

---

[2]By St. 2008, c. 176, § 8, the name of the agency was changed from the Department of Social Services.

[3]Although Imelda is represented by counsel, the judge has not appointed a guardian ad litem.

[4]The judge's findings on the parents' unfitness are based on DCF reports, the court investigator's report, the mother's and father's criminal offender information (CORI) introduced at trial, and the testimony of the paternal grandmother, the only witness at trial. Her testimony was limited to circumstances in the adoptive home.

[5]The relationship between the mother and her parents was strained due, in part, to the mother's relationship with the father. In December, 2005, a DCF investigator found that the maternal grandfather had become somewhat reconciled to the birth of the child and that the mother now viewed her parents as providing a support system.

release, when Imelda was three months old. In September, 2004, the paternal grandmother moved from Brockton to Salem, and the parents moved in with her, at her request. In the late spring or early summer of 2005, the family moved out of the paternal grandmother's home in Salem to a two-bedroom apartment. After the move, Imelda's paternal grandmother frequently cared for Imelda during the day, while the mother was at work.

In September, 2005, the paternal grandmother called DCF and reported that Imelda's parents were fighting with each other, loudly and volatilely, with the child present. The report was screened in pursuant to G. L. c. 119, § 51A. A DCF investigator subsequently determined that the allegations of neglect were "unsupported" as to the mother, who had called the police on several occasions to have the father removed from the home after he became violent, but were "supported" as to the father, who admitted that he had punched holes in the apartment walls and otherwise damaged the apartment during bouts of anger. See G. L. c. 119, §§ 51A & 51B. The investigator's report also noted that the home was "neat and clean" and that Imelda was "dressed appropriately" and appeared to be "well cared for."

On December 28, 2005, an assessment worksheet prepared by a DCF social worker indicated that "overall" DCF's involvement with the family had been positive. The social worker stated that the mother interacted well with Imelda and used appropriate disciplinary measures, but would benefit from a parent aide. The report also noted that the mother felt that the paternal grandmother undermined the mother's disciplinary methods and was inconsistent in maintaining the limits the mother had set.[6]

In January of 2006, the paternal grandmother contacted DCF a second time, alleging that the mother was using Oxycontin and had failed to seek follow-up medical care for Imelda after she suffered an ear infection in December of 2005. The paternal grandmother also reported continuing problems surrounding domestic violence in the home. When a DCF investigator arrived

---

[6]The December 28, 2005, DCF assessment worksheet noted the mother stated that the grandmother would "overstep parenting boundaries" and would defy routines set for Imelda. One example cited by the mother was that she had stopped Imelda from using a bottle and a pacifier, but the paternal grandmother continued giving both items to Imelda, without the mother's knowledge, when she cared for Imelda while the mother worked.

at the house to begin her investigation, each parent initially denied any drug use, but during that same visit, the mother admitted to using Oxycontin and "a small" amount of marijuana, and the father admitted to heavy use of marijuana, estimating he smoked at least fifteen marijuana cigarettes per day. Both parents told the investigator they knew that the grandmother had called DCF. When the paternal grandmother arrived at the house during the investigator's visit, the parents yelled at her. The DCF investigator later confirmed some medical neglect regarding Imelda's follow-up appointments with the pediatrician.

Thereafter, based on its investigation, DCF supported a finding of neglect as to both parents, and filed a care and protection petition pursuant to G. L. c. 119, § 24. Imelda was placed in the temporary custody of DCF in January of 2006. The parents waived their rights to a seventy-two-hour temporary custody hearing, but reserved the right to a placement hearing. At the temporary placement hearing on February 14, 2005, attended by the father, but not the mother, the paternal grandmother was given temporary custody of Imelda. The placement was made on the condition that the paternal grandmother's partner of eighteen years and the father, who was then living in the parental grandmother's house, complete a batterer's program.[7] The mother and father attended a pretrial conference on March 31, 2006.

During the period from January, 2006, through November, 2006, DCF developed three service plans for the family.[8] The service plans required the mother to attend drug screening and

[7]The custody order also required that the paternal grandmother obtain a CORI-approved caretaker other than her two daughters to care for Imelda if the paternal grandmother were going to be gone from the house for more than three hours. The record indicates that neither daughter would be a suitable caretaker. The paternal grandmother's and her partner's fifteen year old daughter suffers from attention deficit and hyperactivity disorder. The paternal grandmother's twenty-one year old daughter suffers from cognitive deficits, and has been arrested on two occasions, once for "disturbance" and disorderly conduct, and once for assault and battery on a police officer. Although the charges were dismissed, the daughter admitted to the adoption social worker that the incidents had occurred.

[8]An earlier plan, included in the DCF assessment worksheet, in effect prior to the filing of the petition, identified tasks designed to keep the child in the parental home, i.e., case management services to provide the mother with a parent aide and reconnecting the father with the "Healthy Families Program." The assessment noted that the parents were accepting of the offered services.

AA meetings before she would be allowed unsupervised visitation with Imelda. However, the mother failed to provide drug screens, failed to provide documentation of attending AA/NA meetings, and missed many appointments with DCF social workers. In addition, the mother admitted that she lied to DCF workers about having obtained certain drug screens. The service plan also required weekly supervised visits with Imelda at the paternal grandmother's home. The mother visited only five or six times and missed twelve scheduled visits during this period. She did, however, call and speak with Imelda "at least" several times per week.

In October, 2006, Imelda filed a notice of intent requesting that parental rights be terminated and stating that adoption by her paternal grandmother was in her best interests. A trial on the parents' fitness was held on November 30, 2006. Because of CORI issues in regard to the paternal grandmother's partner, DCF's attorney stated at trial that DCF could not "officially" support the child's plan.

Neither parent was present at trial. The mother's and father's respective attorneys filed motions to withdraw. The father's attorney reported that the father had been arrested the previous day in another county. The mother's attorney reported that the mother's whereabouts were unknown. The attorneys for both parents were then permitted to withdraw.

Both of the maternal grandparents attended the trial. The paternal grandmother also attended, and testified as the sole witness. The judge found the parents to be unfit and the child in need of care and protection. The judge then continued the trial in order to allow time for completion of an adoption home study of the paternal grandmother and for a determination whether it was in the child's best interests to terminate parental rights. Temporary custody remained with the paternal grandmother.

The "best interests"[9] portion of the trial resumed on February 15, 2007. There were no additional witnesses. The only new evidence consisted of the adoption home study, undertaken by A Red Thread Adoption Services, Inc., and a DCF report that

---

[9] Our understanding is that the "best interests" portion of the trial addressed the plan for the child posttermination and whether termination is in the best interests of the child.

the judge had requested, dated February 13, 2007. Neither of the parents were present, but both grandmothers attended. The child's attorney reported that, according to the DCF social worker, the father had been incarcerated two days previously. At the beginning of the proceedings, the mother's former attorney appeared and stated that he had received a subsequent call from the mother at an unspecified date, but he had been unable to contact her when he tried to return the call.

The DCF report states that the social worker had spoken with the mother, who indicated that she was then at the High Point Treatment Center in Plymouth and was trying to get into a program in New Bedford. The mother informed the social worker that she was sober and wanted to work toward having her daughter with her. The report continued that the social worker had subsequently been informed that the mother was in a halfway house, but that the worker had not confirmed this statement.

The child's attorney introduced the maternal grandmother to the judge and advised the judge that the maternal grandmother wanted to make a statement. The maternal grandmother stated that her daughter had gone "through detox" treatment at "Hyde Point," had been "in holding for almost a month and half" at that facility after detox, and had been transferred to "Evans Stone" three days previously. She said that her daughter did not want to give up her maternal rights and was "doing everything she can."

The attorney for DCF then suggested that "it would make sense for the case to be continued for just a short period of time so that we can explore the issues as it pertains to both parents." The judge declined to do so, stating: "What are the issues? Mother and Father are unfit and they've chosen not to participate in the process." On that same day, the judge issued the decree terminating parental rights.

In her findings, issued in April, 2007, the judge based her determination of unfitness on the mother's alleged failure to provide adequate medical care for Imelda; her admitted drug use; her failure to protect Imelda from an atmosphere of domestic violence; and her failure to complete the tasks required by her service plan, particularly drug screening and participating in supervised visits with Imelda. The judge concluded that termination of parental rights and adoption by the paternal grandmother

was in the child's best interests. The judge also stated that she would not order postadoption visitation. The docket indicates that two weeks later, the mother moved for reappointment of counsel. The judge allowed that motion. Shortly thereafter, the mother moved for a stay of the termination decree pending appeal; that motion was denied.

*Discussion.* On appellate review, "we must determine whether the trial judge abused [her] discretion or committed a clear error of law." *Adoption of Elena,* 446 Mass. 24, 30 (2006). A decision to terminate parental rights involves a two-step analysis. *Adoption of Nancy,* 443 Mass. 512, 515 (2005). First, a determination that the parent is *currently* unfit, and, second, a determination that termination is in the best interests of the child. *Adoption of Mary,* 414 Mass. 705, 710 (1993). Once a parent is found to be unfit, the judge "must then ascertain 'whether the parent's unfitness is such that it would be in the child's best interests to end all legal relations between parent and child.' " *Adoption of Gillian,* 63 Mass. App. Ct. 398, 404 (2005), quoting from *Adoption of Nancy, supra.* Unfitness does not mandate a decree of termination. *Adoption of Vito,* 431 Mass. 550, 568 (2000).

In deciding whether the best interests of the child will be served by terminating parental rights, "the issue 'is not whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " *Adoption of Zoltan,* 71 Mass. App. Ct. 185, 188 (2008), quoting from *Care & Protection of Bruce,* 44 Mass. App. Ct. 758, 761 (1998). The judge must also consider the parents' "natural right to the custody of their children," *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 587 (1981), and the Legislature's intent that the Commonwealth first make all efforts toward keeping the child within her biological family. See G. L. c. 119, § 1; *Custody of a Minor (No. 1),* 377 Mass. 876, 882 n.5 (1979). The judge must find "grievous shortcomings" in order to terminate parental rights. *Adoption of Abby,* 62 Mass. App. Ct. 816, 827 (2005), quoting from *Adoption of Katharine,* 42 Mass. App. Ct. 25, 28 (1997).

Furthermore, in approving a plan for adoption, the judge

must consider both the fitness of the parent and also the suitability of "the plan proposed by [DCF] or other agency initiating the petition." G. L. c. 210, § 3(c). A "judge considering an adoption plan must make specific findings reflecting careful evaluation of the suitability of [DCF's] proposal." *Adoption of Lars*, 46 Mass. App. Ct. 30, 31 (1998). Where such circumstances exist, the judge must also make "detailed and comprehensive findings" regarding domestic violence in the proposed adoptive home and its effect upon the child and on the parenting ability of the potential adoptive parent. *Custody of Vaughn*, 422 Mass. 590, 599-600 (1996). *Care & Protection of Lillith*, 61 Mass. App. Ct. 132, 133, 139 (2004).

1. *Proof of the mother's unfitness.* The mother contends that the judge's subsidiary findings and the evidence do not support the conclusion that she is currently unfit because, by the time the trial had resumed in February, 2007, she had acted affirmatively to seek drug treatment and was no longer involved with the father, who had been the cause of domestic violence in the home. She also challenges the trial judge's finding that her whereabouts were unknown as inaccurate and the finding that Imelda suffered from medical neglect as unproven by a preponderance of the evidence. Finally, the mother contends that the judge failed to consider any of her positive qualities.

While the mother admitted to abuse of Oxycontin and occasional use of marijuana, there was never any allegation made, as required by precedent, that the child suffered as a result of her drug use, or that the mother used drugs in front of the child. See *Adoption of Zoltan*, 71 Mass. App. Ct. at 191, quoting from *Care & Protection of Ian*, 46 Mass. App. Ct. 615, 617 n.4 (1999) (reversing termination of parental rights because evidence did not show sufficient link between the mother's admitted drug and alcohol use and her ability to provide minimally acceptable care to the child, and noting that "[i]t is not enough to state that a parent has a particular condition without detailing the ways in which that condition renders the parent unfit"). See also *Adoption of Katharine, supra* at 34 (cocaine addiction, without more, does not automatically translate to parental unfitness).

To the contrary, as the mother correctly states, notwithstanding her drug use, various DCF social workers reported that the

mother's home was found to be neat and clean, with ample toys, and food, that the child's medications were available, and that the child was well dressed. DCF workers also found that the mother exhibited many parenting strengths, consistently cared for the child until the child was placed with the paternal grandmother, played with the child and disciplined her appropriately, and noted the strong bond between the mother and the child. Again, as the mother indicates, the judge's decision did not discuss any of these positive qualities.

Next, we note that the mother successfully removed herself from an environment of domestic violence. In March, 2006, approximately eleven months prior to the trial, the mother left the father, against whom allegations of domestic violence had been substantiated, and returned to living with her parents in Brockton. Notwithstanding this evidence, and although the judge found that the mother had ended the relationship with the father, the judge also concluded that the mother had "demonstrated no effort to remedy the conditions which have created a risk of harm."

Third, we consider the evidence of medical neglect. The judge found that the mother had medically neglected the child by failing to provide routine and follow-up medical care and by failing to provide the paternal grandmother with the child's medications or health card.[10] The evidence supports a finding of medical neglect, but does not amount to placing Imelda's welfare "much at hazard." Medical staff at the pediatrician's office reported that the child was not brought in for her follow-up visit after treatment for asthma on November 22, 2005, nor after treatment for an ear infection on December 8, 2005, and that

---

[10]We note that, among other findings of medical neglect, the judge made two separate findings that the mother had neglected the child because she failed to provide the paternal grandmother with the child's MassHealth card and medication (a nebulizer), and failed to respond to the grandmother's requests for these items, when the grandmother was caring for the child. The grandmother told DCF that she asked the *father* for these items on the first two days she had the child, when talking to him on the phone. The grandmother took the child to the doctor on the fourth day the child was still with her. On January 9, 2006, the mother told the DCF investigator that she had never been asked to provide these items and that the grandmother took the child to the doctor twice without her knowledge. She showed the social worker the child's nebulizer and medications.

Adoption of Imelda.

she also missed her previously scheduled well-child appointment on December 19, 2005. However, medical staff also noted that the mother had brought the child in for previous immunizations and treatment for asthma and that the child's immunizations were up to date.

Last, we consider the evidence of the mother's failure to comply with DCF service plans. While the mother's behavior is not to be condoned, and in particular her failure to visit Imelda is cause for concern, we note that the court investigator's report dated March 20, 2006, stated that the mother did maintain consistent telephone contact with Imelda.[11] Additionally, between November 30, 2006, and February 14, 2007, it appears that the mother was in drug treatment. On this record, it cannot be fairly concluded that the mother's shortcomings are "grievous" or that Imelda was "much at hazard." *Adoption of Katharine*, 42 Mass. App. Ct. at 28.

Furthermore, despite reports that the mother was in treatment at the time the trial resumed, the judge relied on the mother's absence from trial and her noncooperation with DCF service plans (involving drug treatment) as the most significant reason in finding she was unfit. The judge, having been alerted to what had been reported as the mother's recent positive gains, should have considered whether she would be likely to improve in the future. See *Adoption of Carlos*, 413 Mass. 339, 350 (1992) ("[i]n determining whether that extreme step [terminating the parent-child relationship] should be taken," the judge should explore whether "there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary"); *Adoption of Inez*, 428 Mass. 717, 723 (1999).

Because the evidence introduced at the second portion of the trial casts doubt on several of the findings central to the judge's decision: (1) that the mother had done nothing to address her substance abuse problems; (2) that her whereabouts were unknown; and (3) that she had failed to avoid an atmosphere of domestic violence, we conclude that the record does not clearly and convincingly establish that the mother was unfit as of February, 2007.

---

[11]The record indicates that, for much of the period in question, the mother was living in Brockton and the grandmother was living in Salem. Cf. *Adoption of Leland*, 65 Mass. App. Ct. 580, 584, 585-588 (2006).

2. *Lack of findings regarding domestic violence.* In her only specific finding about the adoptive home, the judge noted that "[Imelda] has thrived while living with her paternal grandmother." See *Adoption of Hugo*, 428 Mass. 219, 230 (1998), cert. denied sub nom. *Hugo P. v. George P.*, 526 U.S. 1034 (1999). Although the judge could properly consider how Imelda was doing in the paternal grandmother's home, this factor should not have been given undue weight. See *Adoption of Katharine*, 42 Mass. App. Ct. at 30 ("if bonds with foster homes were decisive, then the very act of placing a child in a foster home pending judicial proceedings would determine the outcome").

The mother also contends that the judge failed adequately to consider the history of domestic violence in the paternal grandmother's home. We agree. The record raises sufficient concerns regarding domestic violence in the paternal grandmother's home to require "detailed and comprehensive findings of fact on the issues of domestic violence and its effect upon the child." *Custody of Vaughn*, 422 Mass. at 599, quoting from *R.H. v. B.F.*, 39 Mass. App. Ct. 29, 40 (1995). See *Care & Protection of Lillith*, 61 Mass. App. Ct. at 139. We note that one of the conditions under which Imelda was initially placed with the paternal grandmother was that her partner and Imelda's father complete a batterer's program. There was no evidence at trial that either the partner or the father had done so, and no discussion of the issue in the judge's findings.

While the reported incidents of domestic violence in the paternal grandmother's home predate Imelda's placement there, the undisputed evidence shows that the paternal grandmother's partner engaged in acts of physical violence toward the paternal grandmother, resulting, in some instances, in his being placed on probation following criminal proceedings. On one occasion, he flicked a lighted cigarette at the paternal grandmother in the presence of his children, who called the police. The paternal grandmother did not deny that the incident occurred, or that the children called the police, but maintained that the incident was partially her fault because she and her partner had been fighting over whether she was involved with another man.[12] The record further indicates other incidents of domestic violence in the pater-

---

[12]The record also indicates that the paternal grandmother's partner had a

nal grandmother's home, including reports of a rape of the paternal grandmother by the paternal grandmother's former partner, that was witnessed by the father.[13]

The child argues that there was no error because the adoptive home study addressed the issue of domestic violence and concluded that the paternal grandmother was a suitable adoptive resource. The judge, however, made no findings regarding the adoptive home other than to refer to the home study and note its conclusion. This is not sufficient. *Vaughn* cautions that the issue of domestic violence cannot be decided by implication. *Custody of Vaughn, supra* at 595 ("physical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm"). See *Care & Protection of Lillith, supra* at 139.

The judge should have made specific findings on domestic violence in the paternal grandmother's home and its effects on Imelda. Such findings are needed to show that a full and fair hearing took place and that the judge's findings were an "even-handed assessment of the evidence" addressing the "[t]roublesome facts" of the proposed placement. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 260, 261 (1978), quoting from *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688-689 (1975).

3. *Lack of representation.* We are also concerned about the mother's lack of representation at the best interests portion of the trial. See *Adoption of Don*, 435 Mass. 158, 169 (2001) (noting long-standing requirement that parents in child custody proceedings be represented by counsel and that an indigent parent has a constitutional right to court-appointed counsel in proceedings to terminate parental rights). While the circumstances initially warranted striking the appearance of the mother's attorney, those

history of other criminal charges, many of which were dismissed, in some cases after he paid restitution. In one instance, a charge of rape was dismissed after the alleged victim did not appear in court. The partner explained to the social worker conducting the adoption home study that he had been present in the apartment with a friend, and that when the alleged victim, a prostitute, had refused to perform the agreed acts, the friend had demanded she return his money.

[13]See also *supra*, note 7.

circumstances had changed by the time the trial resumed in February. See *Care & Protection of Marina*, 424 Mass. 1003 (1997). When the trial resumed, the mother's attorney did appear and stated that the mother, on an unspecified date, had contacted him. Also, a DCF report indicated that the mother was in treatment. Finally, the maternal grandmother stated that the mother wanted to contest the termination of her parental rights and that the mother had been, and continued to be, involved in drug treatment programs. The maternal grandmother knew which treatment programs the mother attended and was in contact with the mother.

These events prompted *DCF* to request a continuance. The child's attorney opposed a continuance, "because then if [the parents] do show up then they are going to want to have attorneys and we're back in the position of doing the same thing when they did have attorneys." The child's counsel also argued that the parents had a right to file an appeal if they were "not happy with the outcome of today's proceeding." The judge elected to go forward, stating, "So . . . you can all have a conference [concerning an open adoption] but as far as I'm concerned the case is scheduled today and the court is prepared to go forward."

"The decision on whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and the judge's decision will be upheld absent an abuse of that discretion." *Adoption of Gillian*, 63 Mass. App. Ct. at 409-410. Here, where the mother's fundamental right to raise her child was at stake, where the mother's former counsel appeared, where the maternal grandmother imparted information regarding the mother's current status to the judge, where there had been domestic violence in the paternal grandmother's home, and where no showing was made of any potential harm if the trial had been continued, with the child remaining in the temporary custody of the paternal grandmother, the better course would have been to grant a continuance of the proceedings so that counsel could be reappointed before, not after, the final adjudication. See *Adoption of Karla*, 46 Mass. App. Ct. 64, 67 (1998) (prior to an appealable judgment a judge's findings are subject to revision). Compare *Care & Protection of Quinn*, 54 Mass. App. Ct. 117, 120-123 (2002) (no abuse of discretion in a care and protection proceed-

ing in judge's denial of a continuance so father could testify after criminal proceedings). See G. L. c. 210, § 3(*b*).

*Conclusion.* We vacate the decree terminating the mother's parental rights and the judge's determination that the child's plan for adoption by the paternal grandmother was in the child's best interests. Temporary custody is to remain with the paternal grandmother. We remand the case to the Juvenile Court for further proceedings consistent with this opinion, including a hearing forthwith to ensure visits between the mother and child under appropriate circumstances and conditions.[14] These proceedings shall address the mother's current parental fitness and domestic violence in the paternal grandmother's home, and the mother shall be represented by counsel.

*So ordered.*

---

[14]The record does not reflect the current status of visits between the mother and child.