This case involves the welfare of Ulyssia, born in April, 2014. After trial, a Juvenile Court judge issued decrees that, inter alia, found Ulyssia in need of care and protection, found the father unfit, terminated the father's parental rights as to her, and directed that Ulyssia "shall be ordered in the permanent legal custody" of the maternal grandparents.[3] On the father's appeal, we affirm.
Evidentiary issues. To a great extent, the judge's findings here rest on documentary evidence, in particular those documents identified as Exhibits 1-16.[4] The father argues that these documents were never properly admitted as exhibits in the termination trial now under review, but instead are artifacts of an earlier termination trial that ended in a mistrial. In this manner, according to the father, the judge "rel[ied] on facts that are not properly admitted in evidence." Care & Protection of Zita, 455 Mass. 272, 280 (2009). To set this issue in context, we first provide some procedural background.
The first termination trial began on August 11, 2015. At the time the father, who was incarcerated, was not present. On the second day of trial, the father was brought in on a habeas corpus petition, and a mistrial was declared that day. Although the transcript of these earlier proceedings is not before us, the parties agreed during oral argument before this court that the mistrial was declared because of the father's involuntary absence during the first day of trial. It is not clear what witness testimony had transpired that day, but the docket reflects that Exhibits 1-16 were admitted in evidence.
The trial resulting in the termination decree at issue took place on January 4, 2016. The docket indicates that Exhibits 1-16, together with four additional exhibits, were admitted on that date. Although the transcript does not specifically mention Exhibits 1-16 being offered, it does reflect the parties' understanding that these documents were admitted in evidence. Specifically, after counsel for the Department of Children and Families (DCF) referenced exhibits that previously had been admitted, she offered the mother's updated CARI form as "the next exhibit I'd like to admit." The clerk responded that the surrender form executed by the mother would be admitted before the updated CARI, with the surrender form to be marked as Exhibit 17 and the mother's CARI form marked as Exhibit 18. The father's updated CARI form and a police report were then admitted as Exhibits 19 and 20, respectively. At no point did the father's attorney object to these documents being admitted or question why the numbering of the new documents began at 17.
"[D]ocket sheets are part of the court records and may be presented as prima facie evidence of the facts recorded therein." Northeast Line Constr. Corp. v. J.E. Guertin Co., 80 Mass. App. Ct. 646, 651 (2011), quoting from Commonwealth v. Podoprigora, 46 Mass. App. Ct. 928, 929 (1999). See Commonwealth v. Denehy, 466 Mass. 723, 727 (2014), quoting from Savage v. Welch, 246 Mass. 170, 176 (1923) ("Docket entries 'import incontrovertible verity' and 'stand as final' unless corrected by the court"). Here, a contemporaneous docket entry indicates that Exhibits 1-16 were admitted at the new trial. Far from contradicting such prima facie evidence of what happened, the transcript reinforces that the parties understood that Exhibits 1-16 were in evidence.[5] Under these circumstances, we discern no reversible error in the judge's reliance on these documents.[6]
Parental fitness. "While a decision of unfitness must be supported by clear and convincing evidence, a judge's findings will be disturbed only if they are clearly erroneous." Adoption of Paula, 420 Mass. 716, 729 (1995) (citation omitted). The father has not pointed to any factual finding as clearly erroneous, and, in any event, our review of the record confirms that the findings are well supported in the record. In addition, the findings taken together constitute clear and convincing proof of the father's unfitness. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 731. The judge summarized that unfitness as follows: "[H]is extensive history of criminal behavior, namely, as a drug dealer; his instability, and lack of adequate resources and stable home for himself and the subject child; [the] [f]ather's poor temperament, assaultive conduct, and inability to control his temper; and [the] [f]ather's failure to consistently engage in services, consistently visit with the subject child, and consistently cooperate with [DCF]." Especially where the father does not argue that he is currently fit to parent Ulyssia, little would be gained by repeating the detailed subsidiary findings that support the judge's finding of unfitness.[7]
Termination. Of course, "[u]nfitness does not mandate a decree of termination." Adoption of Imelda, 72 Mass. App. Ct. 354, 360 (2008). Ulyssia has lived with the maternal grandparents since October, 2014, when she was six months old. As the judge found, Ulyssia is "well cared for there and in an appropriate placement." Also present in the home is Ulyssia's half-brother (the mother's son by a different father).
The current DCF plan, approved by the judge, is to continue with the maternal grandparents serving as permanent guardians, and not adopting Ulyssia.[8] The father argues that because adoption is not currently on the table, termination of his parental rights was unnecessary, and the judge abused his discretion by ordering it. We disagree. Our cases make clear that an imminent adoption is not a prerequisite to termination. See Adoption of Nancy, 443 Mass. 512, 516-518 (2005). More generally, although unfitness does not mandate termination, it is unfair to leave the child in limbo indefinitely. Id. at 517 ("[I]t is only fair to the children to say, at some point, 'enough' "). With the passage of time, it becomes increasingly important that the child obtain a stable, safe, and nurturing home environment.
Ulyssia is well situated in the maternal grandparents' home, and DCF determined that it was best to seek to sever Ulyssia's ties with the father at this time. In the end, "[w]hile courts protect the rights of parents, 'the parents' rights are secondary to the child's best interests and ... the proper focus of termination proceedings is the welfare of the child.' " Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting from Adoption of Gregory, 434 Mass. 117, 121 (2001). With this overarching standard in mind, we discern no error in the judge's termination of the father's parental rights.[9]
Decree affirmed.

The mother voluntarily surrendered her parental rights and therefore is not a party to this appeal.

For convenience, we will refer to these documents as Exhibits 1-16 even though-as the judge found-one of those exhibits (Exhibit 12) was admitted in error.

To the extent that the father separately argues that even if the Exhibits 1-16 were admitted in evidence in the new trial, they were not properly offered and admitted there, that argument fares no better. The father has not argued, much less shown, that the documents were inadmissible, or that he otherwise was prejudiced from any errors in procedure.

The father separately argues that Exhibit 20, a police report, contains hearsay statements that should not have been admitted. Because no objection was raised at trial, this issue was waived. See Petition for Revocation of a Judgment for Adoption of a Minor, 393 Mass. 556, 563 n.12 (1984).

The father has shown evident affection toward Ulyssia, and the judge's findings do not negate this. "Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the ... father do[es] not love the child." Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017). "The inquiry instead is whether the parent['s] deficiencies or limitations 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " Ibid., quoting from Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

The father maintains that the judge did not conduct a full and fair assessment of his alternative plan that Ulyssia be placed with his mother or sister. It suffices to note that beyond the father's passing reference to his mother and sister during his testimony, nothing in the record indicates that either one has shown any interest in taking custody of Ulyssia or even had met her.

To the extent that the father separately maintains that the judge should have ordered visitation, we discern no merit in that argument. Ulyssia has been in the maternal grandparents' custody since she was six months old, and the father has not seen her for years. There is no existing bond, much less a bond sufficient to warrant mandatory visitation. See Adoption of Vito, 431 Mass. 550, 563 (2000).