In an earlier proceeding, a Juvenile Court judge -- with the mother's consent -- found Iman (born in May of 2015) in need of care and protection and transferred permanent custody to the Department of Children and Families (DCF). The plan at that time was that Iman would be placed with the mother's sister, who would become her permanent guardian. After that placement fell through, DCF's plan changed to adoption by recruitment. Following an evidentiary review and redetermination hearing on October 19, 2017, the judge issued a decree that, inter alia, found Iman in continued need of care and protection, found the mother unfit, kept permanent custody with DCF, and terminated the mother's parental rights.[2] We affirm.
"While a decision of unfitness must be supported by clear and convincing evidence, a judge's findings will be disturbed only if they are clearly erroneous" (citation omitted). Adoption of Paula, 420 Mass. 716, 729 (1995). The judge made careful and detailed factual findings, none of which the mother has demonstrated is clearly erroneous.[3] Those findings set forth the profound challenges that the mother faced as a parent. For example, the mother suffered from mental illness and had a history of drug and alcohol addiction. She in fact relapsed on alcohol just a few months prior to the evidentiary hearing (to the point that she was placed in protective custody).
The mother also was involved in a romantic relationship with a man who physically abused her over an extended period.[4] After DCF pressed her to terminate that relationship, she tried to hide her continued involvement with the man, and the judge found that at the time of trial the only thing that had kept the two from living together was the man's serving a jail sentence for assaulting the mother. The mother herself has a criminal history that includes multiple convictions for both assault and battery and assault and battery on a police officer, resisting arrest, and "use without authority"; at the time of trial she was incarcerated on a charge of assault and battery on a pregnant person.
The mother also did not fully comply with her service plan. She agreed to have a neuropsychological evaluation done, but she did not allow DCF to have input into that evaluation and much of it was based on her own self-reporting. The mother remains unemployed, and despite her making at least some effort to secure suitable housing, she has been unable to do so.[5]
The mother argues that the judge did not give her due credit for strides she had made toward complying with her service plan tasks, and unfairly held against her certain behavior that was of little consequence.[6] We conclude that such criticisms of the judge's findings go to matters of tone and emphasis, rather than to the judge's failure to engage with "troublesome facts." Compare Adoption of a Minor (No. 2), 367 Mass. 684, 688 (1975). None of the mother's arguments undermine the substantive force of the judge's findings, which provide ample clear and convincing support for his ultimate conclusions that the mother was unfit to parent Iman, and that such unfitness was likely to continue for the foreseeable future.[7]
Termination of parental rights. As we have recognized, "[u]nfitness does not mandate a decree of termination." Adoption of Imelda, 72 Mass. App. Ct. 354, 360 (2008). But at the same time, it is unfair to leave children in limbo indefinitely. See Adoption of Nancy, 443 Mass. 512, 517 (2005) ("it is only fair to the children to say, at some point, 'enough' "). With the passage of time, it becomes increasingly important that children obtain a stable, safe, and nurturing home environment. Iman has been placed in a preadoptive home that includes four other children, including Iman's biological sister with whom she shares a room.[8] All of Iman's needs are being met in that placement. In the end, "[w]hile courts protect the rights of parents, 'the parents' rights are secondary to the child's best interests and ... the proper focus of termination proceedings is the welfare of the child.' " Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting Adoption of Gregory, 434 Mass. 117, 121 (2001). With this overarching standard in mind, we discern no error in the judge's decision to terminate the mother's rights.
Posttermination and postadoption visitation. The mother argues that the judge erred by not ordering posttermination and postadoption visits between her and Iman. Although the mother generally "was appropriate" at past scheduled visits, she was observed to engage in some unsafe behavior and "always needed supervision."[9] Moreover, there was no evidence that a significant bond had developed between the mother and Iman (who, having been placed in a foster home directly from the hospital following her birth, has never lived with the mother). Indeed, the judge specifically found that during two observed visits, Iman "would deny [the mother's] affection and would not allow [the mother] to hug or kiss her." We discern neither error in the judge's determination that continued visitation was not in Iman's best interests at this time, nor any abuse of discretion in his decision to leave visitation issues to DCF and Iman's future adoptive parents. See Adoption of Ilona, supra at 64-66. Compare Adoption of Rico, 453 Mass. 749, 755-757 (2009).
Decree affirmed.

The judge also terminated the parental rights of the mother's estranged husband, who disclaimed paternity but took no steps to remove himself from this case. No appeal was taken.

In challenging factual findings numbered 38, 40, 42, and 44, the mother references required service plan tasks that she did perform, and that the judge acknowledged, but she did not address the specific tasks noted by the judge that the mother failed to complete, such as the lack of secure and stable housing; failure to sign all required releases (with no limitations); failure to complete a substance abuse evaluation; and submitting paperwork to the foster care review panel, rather than DCF (as required), relating to her engagement in services.

The mother identified the man as Iman's biological father, although his paternity has not been adjudicated.

The mother claims to have made extensive efforts to locate new housing. The extent to which the judge credited such claims is not clear. Compare conclusion of law 9 ("Mother has struggled to obtain safe housing") with conclusion of law 30 (viii) ("Mother has not taken her ... housing needs ... seriously"). Regardless of the precise extent of the mother's efforts, the fact remains that she has been unable to provide a safe and stable home environment for Iman.

The mother also argues that the judge inappropriately held against the mother her insistence that she have a lawyer present at DCF meetings or visits to her house. Although the judge did reference the mother's position on this issue, we do not interpret these references as indicating that he held this against the mother. In any event, there was overwhelming evidence of the mother's unfitness (rendering any error harmless).

As we previously have stated:
"We pause to note that the mother has shown evident affection toward [Iman], and none of the judge's findings negate this. Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother ... do[es] not love the child. The inquiry instead is whether the parent['s] deficiencies or limitations 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' "
Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

In addition, the preadoptive family has allowed regular visitation with two other biological sisters.

For example, during a supervised visit, the mother "could not keep up with [Iman] and [a DCF social worker] had to run around [the mother] to get [Iman] to keep her from running out of the doorway into a parking lot."