Following a trial in the Juvenile Court, the judge found the father unfit to parent his son, Xuan, and terminated his parental rights. In addition, the judge denied the father's request for posttermination and postguardianship visitation or contact with the child. The father appeals, claiming that the judge abused his discretion by terminating the father's parental rights and declining to order posttermination and postguardianship contact. The child appeals from the order regarding posttermination and postguardianship contact and visitation.[2] We affirm the decree terminating the father's parental rights. However, we vacate the order declining to provide for posttermination and postguardianship visitation or contact and remand the matter for further proceedings and findings on whether such contact is in the child's best interests.
1. Termination of parental rights. The father concedes that he was unfit at the time of trial. He argues, however, that it was not in the child's best interests to terminate his parental rights based on evidence of a "positive" bond between them and because the permanency plan of the Department of Children and Families (department) was for a permanent guardian rather than adoption. We disagree. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). "The standard for parental unfitness and the standard for termination are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.' " Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975). The judge "shall consider the ability, capacity, and readiness of the child's parents ... to assume parental responsibility" in determining whether termination is in the child's best interests (quotation omitted). Adoption of Elena, 446 Mass. 24, 31 (2006). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra. The father claims that this is a situation analogous to Adoption of Flora, 60 Mass. App. Ct. 334, 342 (2004), where "the child's best interest may be served without a decree of termination." However, there is ample evidence here to support the judge's conclusion that termination was in the child's best interests.
The father maintains that because the department's permanency plan for the child is a permanent guardianship and not adoption, termination of his parental rights was an abuse of discretion. This argument fails because " G. L. c. 119, § 26 (4), provides that a judge 'may enter an order to dispense with the need for consent of any person named in [ G. L. c. 210, § 2 ], to the adoption, custody, guardianship or other disposition of the child ... upon a finding that the child is in need of care and protection ... and that the best interests of the child will be served by such an order.' " Adoption of Nancy, 443 Mass. at 516-517, quoting G. L. c. 119, § 26 (4). See G. L. c. 210, § 3 (b ).
The father also claims that termination was not in the child's best interests because there is a loving bond between the father and child, and he made efforts to "improve his personal and parental deficiencies." However, a bond does not preclude termination of parental rights; it is but one factor to weigh. See Adoption of Bianca, 91 Mass. App. Ct. 428, 432 (2017). Here, the judge's ninety-two findings of fact and thirty-eight conclusions of law were specific and detailed, demonstrating that close attention was paid to the evidence. See Adoption of Nancy, 443 Mass. at 516. The judge's findings make clear that he considered the father's current unfitness and whether that unfitness was likely to be temporary. See Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018).
The judge considered the requisite factors under G. L. c. 210, § 3 (c ), and found that factors (ii), (iii), (v), (vi), (vii), (viii), and (xii) were applicable. The judge's findings demonstrated a link between the father's history of drug and alcohol use and his continuing patterns of parental neglect of the child. The father also has a history of domestic violence with the mother. He admitted to being the aggressor in these incidents, some of which occurred in the child's presence. In addition, the father has a history of domestic violence in a previous relationship. He has a long and varied criminal record dating back to 2000, with charges including, among others, assault and battery, breaking and entering, possession of a class E controlled substance, threats, and various motor vehicle offenses.
Finally, the father did not sufficiently engage with his service plan tasks -- his progress was both incomplete and inconsistent.[3] See Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2003) (evidence of failure to completely engage in service plans relevant to determination of unfitness and termination). Furthermore, upon his release from incarceration in June, 2017, the father did not visit the child, although he contacted a department social worker to set up a meeting with her about visitation. He subsequently cancelled the meeting, however, and did not respond to her four attempts to contact him. The father was not present at the termination trial, although he was represented by counsel. The judge did not abuse his discretion in drawing a negative inference from the father's absence. See Adoption of Talik, 92 Mass. App. Ct. 367, 371-372 (2017). The judge concluded that the father "exercised a lack of effort to remedy the conditions that created the risk of harm" to the child, and that "[t]he Court reasonably expects that Father will not be able to provide proper care or custody within a reasonable time in the context of [the child's] young age."
In sum, "[a]lthough it would be better practice specifically to state the reasons that termination is in the child's best interest, such specificity is not required." Adoption of Nancy, 443 Mass. at 516. The judge made detailed and thorough findings that are supported by the record, and he considered a "constellation of factors" in reaching the conclusion that the father was unfit and termination of his parental rights was in the child's best interests. Adoption of Greta, 431 Mass. 577, 588 (2000). "Although '[u]nfitness does not mandate a decree of termination,' and termination is not a prerequisite for guardianship, it is unfair to leave a child in limbo indefinitely." Adoption of Xarina, 93 Mass. App. Ct. 800, 803 (2018), quoting Adoption of Imelda, 72 Mass. App. Ct. 354, 360 (2008). There was neither error nor abuse of discretion.
2. Posttermination and postguardianship contact. The father and the child both claim that the judge abused his discretion in declining to order some type of posttermination and postguardianship visitation or contact. Although we express no opinion on the ultimate question whether contact or visitation would be in the child's best interests, we agree that the findings relating to such contact are not sufficient.
Once it is established that a parent is unfit, any visitation or contact order is left to the sound discretion of the trial judge. See Adoption of John, 53 Mass. App. Ct. 431, 439 (2001). The decision must be "grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation." Adoption of Vito, 431 Mass. 550, 562 (2000).
Here, the judge expressly denied posttermination and postguardianship contact or visitation, concluding that it was "not in the subject child's best interest based on the Department's recommendation." However, the only mention of the department's view on visitation or contact was in closing argument at trial, where the attorney for the department stated that "[t]he Department is looking for termination of parental rights of [the father] .... No post-termination contact/post-guardianship contact, Judge. No phone calls." Otherwise, there is no evidence of a department recommendation in either the department's permanency plan or in the social worker's testimony at the termination trial.[4] The judge stated that he saw "no discernable bond" between the father and the child. However, although the extent of their bond is not addressed in any detail in the findings, there was evidence of some bond between the father and the child.[5] At trial, the child's attorney (who is not appellate counsel) stated that the guardian "has no desire to have father involved because there hasn't been anything positive that she knows of." As it does not appear that the guardian had custody of the child at the time of the regular telephone calls between the father and the child or during the period in which the father's visits occurred, this statement does not lend support to the judge's decision. Neither did the judge address any other form of contact between the father and the child, such as cards or letters to the child.[6]
The decree terminating father's parental rights is affirmed. The order declining to provide posttermination and postguardianship visitation or contact is vacated, and the matter is remanded for further consideration and findings in accordance with this memorandum and order.
So ordered.
Affirmed in part; vacated in part and remanded.

The mother stipulated to the termination of her parental rights and entered into an open guardianship agreement. She is not a party to this appeal.

The father did complete some work toward goals that were part of his service plan during his incarceration, including a fathers' nurturing program and a stress management program. However, the father did not provide proof of attendance sheets of AA meetings in 2017 to the department.

At oral argument the department conceded that its recommendation was not tied to anything in the record.

The father visited the child prior to his 2016 incarceration and while incarcerated spoke with the child by telephone every Sunday. This contact occurred while the child was placed with the paternal uncle and his family. After his release, the father visited the child four times between February and April, 2017, when he was incarcerated again on a probation violation. It is unclear from the record whether the father missed any scheduled visits from February to his April, 2017, incarceration. From April, 2017, forward, the father did not visit with the child nor did he have telephone contact with him. It is unclear from the record whether telephone calls were offered or available during this latter incarceration as they were previously. The circumstances of the child's placement had changed from the paternal uncle's home to that of the guardian.

This type of contact was provided for (in addition to visitation and telephone calls) in the guardianship agreement the mother signed.