After a four-day trial in July and August, 2016, a Juvenile Court judge found the mother and father unfit[3] to parent the child, and ordered the entry of decrees terminating their parental rights. The mother appeals, arguing that the absence of a recording of the parents' testimony on one day of trial was a structural error that requires reversal, and that the trial judge abused her discretion and committed an error of law by not ordering posttermination visitation and sibling visitation. The father also appeals, arguing that the evidence does not support the finding that he was unfit by the standard of clear and convincing evidence, and alleging that several structural errors (delay in proceedings, failure to swear in a witness, inability to reconstruct the parents' testimony) mandate reversal.
Background. After four days of testimony and the introduction of over a dozen exhibits, the judge ordered the entry of decrees terminating the parents' parental rights on November 22, 2016. On March 2, 2018, the judge issued 271 findings of fact and conclusions of law. See G. L. c. 210, § 3 (c ). The child was born in Virginia to the mother and father in 2005, and was eleven years old at the time of the trial in 2016. The child has one older and two younger sisters, one of whom is a half-sister.[4]
The mother has a long history of substance use disorder. By June, 2015, the mother had been in eight outpatient detoxification programs and one inpatient drug treatment program. The mother has been diagnosed with anxiety, depression, and bipolar disorder. Her criminal record includes over seventy charges for various crimes. The mother has maintained her sobriety since September, 2015, but during the period between 2015 and the date of the trial, she has resided in a psychiatric hospital, a residential treatment program, or been incarcerated. There was concern that the mother is not capable of sustaining her sobriety or adequately caring for the child outside the confines of such restrictive, controlled settings.
The father was diagnosed with attention deficit hyperactivity disorder (ADHD) as a child but did not receive any special education services while he was in school. The court clinician noted that the father had "a high probability of having a substance use disorder" even though he did not meet the criteria for a specific substance abuse disorder and denied any substance abuse problem.[5] His criminal record includes numerous driving-related charges.
The child tested positive at birth in February of 2005 for prescription drugs that were not prescribed to the mother, triggering the Virginia child protective services agency (CPS) to open a case. On August 14, 2006, CPS removed the child from the parents' custody and placed her in foster care. Her speech and motor development were delayed and she exhibited attachment issues. On October 3, 2006, the father regained custody of the child with the expectation that he would participate in services recommended by CPS. Additionally, the mother was prohibited from living with the father and the child.
On December 13, 2006, CPS again placed the child in foster care. The parents then moved to Massachusetts. The child's paternal grandparents, who lived in Massachusetts, eventually obtained permanent custody of the child pursuant to a stipulation filed in the Probate and Family Court; the parents were allowed visitation with the child. The child moved into the paternal grandparents' home in June, 2007. By March, 2010, the father was living at the paternal grandparents' home with the child.
In April, 2010, the child became frightened when her parents engaged in a loud argument in the paternal grandparents' home, resulting in her paternal grandfather obtaining a restraining order against the father; the father was ordered to vacate the grandparents' premises. Sometime in 2011, the father obtained an apartment in the same complex as the paternal grandparents. In January, 2011, the Probate and Family Court vacated the paternal grandparents' guardianship of the child and awarded the parents shared legal custody of the child with physical custody granted to the mother.[6]
The child resided in Massachusetts with the mother between January, 2011, and March, 2014. The child was prescribed medication in first grade for attention issues, and the school staff noted that it seemed to help her. The child continued to struggle academically in second grade, although she was "satisfactory" in her "social development" and "work habits."
The father failed to acknowledge the effects of the mother's substance use on the child. Eventually, after the mother tested positive for cocaine on March 17 and 21, 2014, the department investigated reports of neglect of the child by the mother, and the child was placed in the care of the father. Even though the father understood that the child was not to have any unsupervised contact with the mother, he allowed the mother into his apartment where the couple once again loudly argued, scaring the child. The father also failed to consistently address the child's unique medical needs. Starting in 2014, the father repeatedly failed to address the child's academic and emotional needs despite the department urging him to seek additional services for her.
The child has witnessed the mother using drugs. She has also witnessed the mother being revived by emergency personnel after overdosing on drugs. In 2015, the mother overdosed four times in two weeks, and was hospitalized for substance abuse treatment.
Service plans were developed in February, 2015, for the mother and father. The mother's plan required her to enter into and successfully complete a long-term residential substance abuse treatment program. The father's plan required him to refrain from alcohol abuse, engage in individual treatment to address his relationship with the mother, demonstrate understanding and insight into how his decisions impacted the child, verbalize concrete examples of areas of concern, request a referral for a psychological evaluation, participate in a fathers' group, participate in weekly telephone calls with the child, visit with the child at the visitation center, and meet with the department worker on a monthly basis. The parents did not completely comply with their tasks.[7]
In April, 2015, the department filed a care and protection petition on behalf of the child. After a hearing on April 22, 2015, temporary custody of the child was granted to the department, which placed her with her paternal uncle on Cape Cod.
During the court investigation in June, 2015, the child mentioned that the mother was using drugs and the father was not "putting her as his first ability." She also said that, when she was living with the father, the refrigerator was often empty and that she spent much of her time at the paternal grandparents' apartment. The child described how her parents' arguments frightened her. While in her paternal uncle's care on Cape Cod, the child eventually became enrolled in extracurricular activities, her hygiene and academics improved, she took medication that helped her ADHD, and she was referred for individual counselling sessions.
The judge found that the child has experienced great turmoil and chaos in her life and has a heightened need for certainty, stability, and permanency in her life, as well as a skilled and committed caretaker to help her access the services she needs. Based on the court clinician's testimony, the judge found that the father's negative attitude toward psychiatric and therapeutic services would most likely present problems in parenting the child.
On November 2, 2015, the department's goal for the child changed to adoption due to the parents' lack of progress toward reunification. The adoption plan is for the child to be adopted by her paternal aunt in Virginia.[8] If that paternal aunt could not adopt the child, the department would explore other kinship options or recruit an adoptive home for her by making a referral for recruitment.
Discussion. 1. Standard of review. Parental rights are fundamental and cannot be terminated unless a judge determines by clear and convincing evidence that the parent is currently unfit and that termination is in the best interests of the child. See Adoption of Mary, 414 Mass. 705, 710 (1993) ; Adoption of Imelda, 72 Mass. App. Ct. 354, 360 (2008). Additionally, "[a]bsent a showing that the judge's findings are clearly erroneous, they are left undisturbed." Adoption of Mary, supra.
2. Failure to record the parents' testimony. The mother argues that the absence of a recording of the parents' testimony on one day of trial is a structural error mandating reversal due to the importance of the parents' testimony and the mother's limited ability to recreate her testimony. The father argues that counsel could not reasonably be expected to reconstruct the father's testimony based on the delay in the proceeding and therefore the failure to record the testimony resulted in a structural error requiring reversal.
Structural errors are not errors that occur in the trial process itself, but rather errors that affect the framework in which the trial proceeds. Weaver v. Massachusetts, 137 S. Ct. 1899, 1907 (2017). Structural errors are a "particular type of error" that render a trial either "fundamentally unfair or an unreliable vehicle" for determining the truth. Commonwealth v. Hampton, 457 Mass. 152, 163 (2010). See Adoption of Gabe, 84 Mass. App. Ct. 286, 293 (2013) (doctrine of structural error "does not control civil issues [but] affords a useful analysis"). Rule 8 (c) of the Massachusetts Rules of Appellate Procedure, as amended, 378 Mass. 932 (1979), which sets forth the procedure for reconstructing missing testimony, allows the appellant to file a statement of the evidence or proceedings within thirty days after the notice of appeal is filed. In this case, notices of appeal were filed on December 19 and 21, 2016. The father claims it was not known for more than thirty days after the notices of appeal were filed -- until January, 2018 -- that records were missing. Yet, both parents were allowed to submit reconstructions of their testimonies and closing arguments. The father submitted his summary of testimony and closing argument on January 22, 2018, and the mother submitted her reconstructed testimony and summary of closing argument on April 4, 2018.[9] More importantly, neither the father nor the mother has identified any prejudice as a result of the evidence not being recorded. Neither persuasively establish that any of the comprehensive factual findings were incorrect. The lack of a record did not prevent the parents from presenting a case or receiving a fair hearing. For these reasons, we conclude that the absence of the parents' recorded testimony is not a structural error since the trial was not rendered fundamentally unfair.
3. Delay in completed findings. The father argues that the delay between the trial and the issuance of detailed findings of fact (nineteen months) requires reversal because Juvenile Court Standing Order 2-07(III)(C) (2007) requires a judge to issue findings of fact within ninety days of the close of evidence. Timeliness in these cases is of the utmost importance, but the father has not shown that the delay in this case resulted in prejudice. The father also contends that inconsistencies between the judge's findings and the court clinician's testimony about the father's deficiencies show that too much time has elapsed to give the judge's findings the usual deference. Here, however, as we have noted, the judge's findings of fact are supported by the evidence.[10]
4. Father's unfitness.[11] The father argues that there was not clear and convincing evidence demonstrating either that he was unfit or that the child would be harmed if returned to his care and custody. There was ample evidence presented at trial to establish support for the judge's finding that the father is unfit to parent the child. First, the judge relied on evidence of the father's mental health problems, history of alcohol abuse, and criminal record. Even though the father denies any substance abuse, according to the court clinician, he has "a high probability of having a substance use disorder." His challenging behavior is connected with a personality disorder. Second, he failed to protect the child from the mother and the risks she presented by repeatedly exposing the child to the mother and her drug use, contravening explicit instructions by the department. Third, the father was unable to keep the child's doctor's appointments and to refill her ADHD medication, demonstrating medical and educational neglect that makes him unfit to parent the child. Fourth, the court clinician noted that "[t]he father's ability to provide a stable home ... is very questionable." The father also has not maintained stable employment, which he initially attributed to his back pain and then to the many requirements of his department service plan. Given the totality of the circumstances, the judge was warranted in concluding that the father is unfit and that it is not in the child's best interests to be returned to his care and custody.
5. Challenges to subsidiary findings. The father contends that several of the judge's findings are not supported by a preponderance of the evidence. First, the father argues that the evidence does not support the judge's finding that he does not "have the genuine ability to comprehend the neglect his daughter has suffered." However, there is ample support for this finding considering the totality of the record. For example, it is undisputed that the mother overdosed twice in the child's presence. Despite this fact, the father continuously minimized the effects of the mother's drug use on the child. He repeatedly allowed the mother to visit with the child unsupervised contrary to the department's recommendation. Further, he failed to provide adequate food for the child while she was in his custody. These basic findings, among others, support the judge's general finding that the father does not appreciate the neglect suffered by the child.
Second, the father claims that the evidence did not support the finding that he was unable "to protect [the child] from being exposed to mother's substance abuse." However, the child was twice present when the mother overdosed and was revived. The father did not seek custody of the child even though he knew the mother was abusing drugs and taking the child with her when buying drugs. He failed to notify police after the child described for him in detail the "secret stash" of drugs and pipes she had found in his apartment. This history supports the finding that the father is unable to protect the child from the mother's substance abuse and that the child would be harmed if returned to his care and custody.
Third, the father claims that the evidence does not support the judge's finding that he had frustrated the child's educational achievement. The judge made numerous findings that the father did not engage with the school staff, that he sent the child to school with her homework incomplete, and that for several months he sent the child to school without her ADHD medication. The father also refilled the child's ADHD medication only once and kept expressing his disdain for the medication even though the child stated that it helped her. There was support in the evidence for the finding that the father frustrated the child's educational achievement.
6. Visitation. The judge ordered a continuation of supervised parent-child visits at least once per month after the termination of parental rights but before adoption. Further, once the child is placed with the preadoptive parents in Virginia, the judge ordered that she "shall be entitled to enjoy contact with her parents by telephone, Skype, FaceTime and email. The preadoptive parents shall be entitled to supervise all such contact should they deem it necessary. The preadoptive parents shall determine the frequency, manner and length of all such contact; their decision to be made on what is in [the child's] best interest, beneficial to their parenting of [the child], and realistic in the running of their household. The decision of the preadoptive parents shall be final." The mother argues that the judge abused her discretion by ordering parent-child visitation but leaving the frequency and manner of the visits to the discretion of the preadoptive parents. The mother also argues that the judge committed an error of law by not ordering sibling visitation.[12]
Regarding parent-child visitation, the judge properly left the details of the visits to the discretion of the preadoptive parents. As in Adoption of Ilona, 459 Mass. 53, 64-65 (2011), there is no reason in this case, on the record before us, to question the presumption that the preadoptive parents will continue to permit visitation between the parents and the child. Here, the judge found that the preadoptive parents would continue visiting Massachusetts approximately twice a year for the child to visit the parents, subject to an opt-out by the child, apparently crediting the testimony of the department social worker and the "customary routine" of the preadoptive parents.
"If siblings are separated through adoption, a judge 'shall, whenever reasonable and practical based upon the best interests of the child, ensure that the children ... shall have access to and visitation with siblings.' " Adoption of Zander, 83 Mass. 363, 367 (2013), quoting G. L. c. 119, § 26B (b ). The judge's order provides that "the parents are encouraged to include [the child's] sisters ... in such contact to ensure that the child maintains contact with these siblings." We interpret this to require that when the preadoptive parents visit Massachusetts, all reasonable and practical steps must be taken to ensure that the child has visitation with her siblings.
Conclusion. The judge did not err in finding the mother and father unfit to meet the child's needs, nor in terminating their parental rights.
Decrees affirmed.

"Despite the moral overtones of the statutory term 'unfit,' the judge's decision is not a moral judgment, nor is it a determination that the parent does not love the child. The question for the judge is 'whether the parent's deficiencies place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " Adoption of Lisette, 93 Mass. App. Ct. 284, 285 n.2 (2018), quoting Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011).

The other children are not involved in these proceedings.

In 2001, the father was treated at South Shore Hospital following a suicide attempt. Despite this experience, he denies experiencing any mental health issues or having any mental illnesses.

The father resisted pursuing custody of the child on numerous occasions, despite overwhelming evidence that the mother was struggling with drug use and exposing the child to drug transactions at night, stating that he could not take time off from work, did not want to "crush the mother," or did not want to disrupt the child's home environment.

The mother informed the department in March, 2015, that she was staying with the father and the child at the father's apartment. She continued to do so, despite being informed by the department that she could not do so. It was evident that the mother was not taking part in a residential substance abuse treatment program and that the father was unable to appreciate how the mother's substance abuse affected the child. During the father's appointment with his department social worker in July, 2015, the father opined that the service plan tasks were a waste of time. He also denied that his behavior or relationship with the mother contributed to the department's involvement with the family, and that the mother was "the one who has the issues."

In July, 2015, the child's paternal aunt visited the paternal uncle on Cape Cod and cared for the child during the day. The paternal aunt submitted an application to be considered as a foster placement for the child. The department requested CPS to conduct a home study of the paternal aunt's family in Virginia to enable the child to be placed with them. The home visit with the paternal aunt and her family took place in August, 2015, in Virginia, during which the child expressed an interest in living with that family if she could not live with both her parents. The paternal aunt had previously adopted the child's older biological sister in 2006.

The parties also had recourse under Mass. R. Civ. P. 60 (b) (6), 365 Mass. 828 (1974). The father is incorrect in asserting that such a motion must be brought within one year. See Mass. R. Civ. P. 60 (b).

The father notes that the court clinician was never sworn in. However, because no authority is cited nor argument made, this issue does not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

The mother does not appeal from the finding of her unfitness.

The father did not adequately raise these arguments in his brief.