## CUSTODY OF VAUGHN.[1]

Nantucket. December 7, 1995. - May 7, 1996.

Present: LIACOS. C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY & FRIED, JJ.

*Parent and Child,* Custody. *Minor,* Custody. *Abuse Prevention. Battered Woman Syndrome. Probate Court,* Custody of child, Findings by judge.

A custody matter was remanded to the Probate and Family Court for detailed and comprehensive findings of fact on the issues of domestic violence and its affect on the child in question and on the father's parenting ability. [599-600]

CIVIL ACTION commenced in the Nantucket Division of the Probate and Family Court Department on October 2, 1992.

The case was heard by *Eliot K. Cohen,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Wayne F. Holmes* for the father.

*Carol A. Witt (Ronald J. Mone* with her) for the mother.

*Jacquelynne J. Bowman, Barbara H. Mitchell, Joan Zorza, Jamie Ann Sabino, & Christine Butler, & Nechama Maslian-sky,* of New York, for Massachusetts Law Reform Institute & others, amici curiae, submitted a brief.

FRIED, J. In 1993, a Probate and Family Court judge awarded primary physical custody of a boy (Vaughn), at the time age eleven years, to his father (Ross). The Appeals Court reversed and remanded the case to the Probate and Family Court for further consideration of evidence regarding domestic violence perpetrated by the child's father against his mother (Leslie) and the effect of the family violence on Vaughn. *R.H.* v. *B.F.,* 39 Mass. App. Ct. 29 (1995). We granted Ross's application for further appellate review. We are in agreement with the Appeals Court. We reverse the

---

[1]Fictitious names have been assigned to the principals.

judgment and remand for further findings consistent with this opinion.

### I

Leslie and Ross met in Maine in 1977. Leslie, who was twice divorced, lived with her two children, a girl (Laura) then age nine years and a boy (John) age five years. Leslie worked as a real estate salesperson during the day and as a cocktail waitress at night. The Probate Court judge found that she "has been an abused person. She was abused as a child, she was divorced twice and has endured abuse because of her relationships." Ross, a former marine engineer, was working odd jobs as a carpenter and painter at the time. Shortly after they met, Ross moved into Leslie's home. They have never married. Ross is a big man, six feet five inches tall and weighing some 285 pounds. Leslie is five feet seven inches tall and weighs 150 pounds. The disparity in their size is relevant, because the relationship was fraught with anger and violence from the start. Ross had a terrible temper. The judge found that he "would fly into rages" and strike out at Leslie, once causing her to lose consciousness and requiring her to be sent to the hospital in an ambulance. According to testimony, he inflicted injuries on her on numerous other occasions. Laura and John witnessed a number of these incidents and were terrified of Ross and his rages. The testimony and findings of fact reflected that Ross was also physically and verbally abusive toward them. Both Ross and Leslie drank heavily and used marihuana. Since Leslie joined "Al-Anon" in 1978, her consumption of alcohol has diminished. The testimony is that she drinks mostly on social occasions. Ross has been alcohol free since 1985 and continues to attend Alcoholics Anonymous meetings once a week.

In 1981 the family moved to Nantucket where Leslie obtained a position as a real estate broker. Vaughn was born on July 18, 1982. After the move to Nantucket, Ross began working as a carpenter and caretaker. Leslie was successful at her work and at the time of trial was earning over $100,000 a year. Ross was much less successful financially, although he appeared to have a number of clients with second homes on Nantucket who relied on his services, and at least one of whom established a close friendship with him and Vaughn.

Ross's rages and violence toward Leslie, Laura, and John

continued after Vaughn's birth. There was testimony that the police were called on approximately one dozen occasions. Ross's anger and violence, however, did not cease, and he sought psychiatric help. A psychiatrist prescribed Lithium, and there was testimony that when Ross discontinued taking it (on his own) his moods and behavior worsened. Leslie testified that on several occasions she left the house with her children to escape Ross's behavior, that many times Ross also took Vaughn from the house in the course of arguments, and that Ross used the threat of taking Vaughn from his mother as a way of keeping the mother in the relationship. Vaughn was present at many of the episodes of abuse.[2] There was testimony that the father's disposition to use physical force was played out on the boy as well, with cuffing, pushing, knocking, and poking; he also yelled and lost his temper at the boy, as he did at every other member of the household.[3] Laura, who is now a graduate student, further testified that, when she was a teenager, Ross kissed her on the mouth in an inappropriate manner and touched her body in an inappropriate, sexual manner.

The judge also found that Leslie engaged in taunting, provocative, and violent behavior toward Ross. On several occasions she assaulted him in a sexual and humiliating manner. It appears that for some years the parties had not shared a bedroom, and on at least one occasion Leslie without any immediate provocation taunted Ross for his sexual neglect of her. In 1986, on the occasion that received the most attention, she entered Ross's room nude and proceeded to taunt him in the grossest and most explicit terms within the boy's hearing. In 1988, in another similar incident, the judge found that Leslie, "when rejected after demanding sexual favors from [Ross] followed him from the house to the public road. She was naked and directed foul language at him. This too was done in the presence of [Vaughn]."

Until Vaughn was five years old his mother was his primary caretaker. Thereafter Ross undertook more and more responsibilities. Apparently he did the shopping and cooking

---

[2]The judge found that "[t]he conduct of the parties to each other has been done in the presence of [Vaughn] as well as [Leslie's] other two children."

[3]The judge made no finding to this effect regarding Vaughn and instead found a strong bond between father and son.

for the household over the five years immediately prior to trial, and he was greatly occupied with his son's activities. Ross followed his son's progress in school,[4] visited his teachers, attended his sporting events, and joined him in target shooting and other activities.[5] Indeed the evidence suggests that Ross was, if anything, overly involved with his son. He embarrassed his son at times by participating in games with him or cheering with excessive enthusiasm at his team sports, and the two would shower together and would give each other massages. Ross has been very generous to Vaughn — the mother complains overly generous — buying him motorbikes and electronic equipment.[6]

The tension and violence between the parents finally led Leslie, on October 1, 1992, to obtain an order in the District Court pursuant to G. L. c. 209A (1994 ed.), requiring Ross to vacate the couple's home, to surrender custody of the boy to the mother, and to remain away from the home and the mother. The next day Ross commenced this action in the Probate Court to establish paternity (which is not in dispute) and to obtain custody of Vaughn. The parties promptly entered into a temporary agreement providing for joint legal and physical custody, according to which the boy would spend part of each week with each parent. During this arrangement the father bought out the mother's share of the house in which they had been living, and the mother moved

[4]The judge found that Vaughn "is doing well at school. His guidance counsellor is hopeful he will continue to shine in school as he did during his last marking period."

[5]The judge found that "[t]he mother acknowledges that [Ross] is most interested in [Vaughn] and is involved in [Vaughn's] activities. . . . She acknowledges that [Ross] 'really cares about [Vaughn].' He is affectionate and concerned about his education."

[6]The judge found: "While the mother has been more strict and the disciplinarian, the father has been more liberal with [Vaughn] and has acted more like a friend and companion. The father has been generous with [Vaughn]. . . . While much of [Ross's] conduct and treatment of [Vaughn] may be questionable (i.e. the scented oil massages they give to each other and their showering together) as well as [Ross's] permissiveness with [Vaughn], the father and son have clearly developed a special relationship. The evidence does not reflect that [Vaughn] has been hurt by this relationship. To the contrary it establishes the very strong bonding between father and son. [Ross] for some five to six years has been [Vaughn's] primary care giver. He has been responsible for most of the cooking, shopping and caring for [Vaughn]. [Vaughn] has been his main involvement, while the mother has been significantly involved in her real estate career."

into a new home. The parties also agreed that Dr. Michael D. Abruzzese, a clinical psychologist whom they had previously consulted along with the child, should be appointed guardian ad litem to make an evaluation and report regarding custody of the child. On February 21, 1993, Dr. Abruzzese delivered his report, recommending that joint custody be continued but that the boy's primary home during the week be with his father with weekends to be spent with his mother.[7] Thereupon the Probate Court entered a new temporary order maintaining the joint legal custody but giving the father primary physical custody and visitation rights to the mother, substantially in accord with Dr. Abruzzese's recommendations.

After a three-day trial in July, 1993, the Probate Court entered a supplementary judgment on September 7, 1993, in effect continuing this arrangement. The parties were to have joint legal custody with primary physical custody to the father and secondary custody to the mother. A visitation schedule was to be set up for weekend, midweek, and holiday visitation by Leslie. She was to maintain the child's medical and health insurance and to pay Ross $135 a week as child support. Furthermore, both parents were ordered to remain in therapy to deal with their own emotions and conduct to each other and their relationship to the child.

Leslie appealed to the Appeals Court, which reversed the judgment of the Probate Court for errors of law and remanded the case to that court. Pending a new judgment the custody arrangements in the parties' initial stipulation were ordered reinstated.

## II

### A

The Appeals Court based its remand to the Probate Court on the failure of that court to make findings regarding the evidence that the father had physically abused the mother throughout the relationship and the effect of this abuse on the

---

[7]The judge found that "Dr. Abruzzese indicated that both mother and father were good parents. The mother was more strict [sic] and the father more nurturing. This was a non typical family, in that the mother was the breadwinner and the father the nurturing parent."

child.[8] The Appeals Court gave great weight to this court's
Gender Bias Study of the Court System of Massachusetts
(1989) and particularly to the recommendation in that study
that,

> "The legislature and/or appellate courts should make
> it clear that abuse of any family member affects other
> family members and must be considered in determining
> the best interests of the child in connection with any or-
> der concerning custody."

The Appeals Court's remand order is designed to do just
that. We endorse the Appeals Court's commitment to the
propositions that physical force within the family is both in-
tolerable and too readily tolerated, and that a child who has
been either the victim or the spectator of such abuse suffers a
distinctly grievous kind of harm.[9] It might be helpful to em-
phasize how fundamental these propositions are. Quite simply,
abuse by a family member inflicted on those who are weaker
and less able to defend themselves — almost invariably a
child or a woman — is a violation of the most basic human
right, the most basic condition of civilized society: the right
to live in physical security, free from the fear that brute force
will determine the conditions of one's daily life. What our
study and the growing movement against family violence and
violence against women add to this fundamental insight is

[8]The mother makes a number of claims that we need not address in
detail: that the order of joint custody was not in accord with the third
paragraph of G. L. c. 209C, § 10 (*a*) (1994 ed.); that the court's finding
that the father was the child's primary care giver was unsupported and
clearly erroneous; that certain rulings of the judge were incorrect; that the
Probate Court judge should have allowed the mother's expert to interview
the father; and that the judge improperly denied the mother's motion that
he recuse himself because he had in effect prejudged the case by his
temporary pretrial orders. The issue of the propriety of the joint custody
award is dealt with in our disposition below. We conclude that the other
claims are either subsidiary to the issue we proceed to determine or that
the Probate Court judge's disposition of them was in accordance with law
and not an abuse of discretion.

[9]To the same effect, see the definition of "[s]hared physical custody,"
G. L. c. 208, § 31 (1994 ed.): "In determining whether temporary shared
legal custody would not be in the best interest of the child, the court shall
consider . . . whether any member of the family has been the perpetrator
of domestic violence."

that, for those who are its victims, force within the family and in intimate relationships is not less but more of a threat to this basic condition of civilized security, for it destroys the security that all should enjoy in the very place and context which is supposed to be the refuge against the harshness encountered in a world of strangers. Particularly for children the sense that the place which is supposed to be the place of security is the place of greatest danger is the ultimate denial that this is a world of justice and restraint, where people have rights and are entitled to respect. The recent literature also exposes the sham and hypocrisy that condemns violence among strangers and turns a blind eye to it where its manifestations are most corrosive.

The Gender Bias Study concludes that our courts have too often failed to appreciate the fundamental wrong and the depth of the injury inflicted by family violence. In subtle and overt ways the decisions of courts fail to take these factors into account and have treated them with insufficient seriousness in making dispositions, particularly in cases involving custody of children and the realignment of family relationships in divorce and related proceedings. The Appeals Court found just such failures of attention and emphasis in the Probate Court's treatment of this case.

### B

The Appeals Court was critical of the Probate Court in a number of related respects. First, the Probate Court judge "fail[ed] to make detailed and comprehensive findings of fact on the issues of domestic violence and its effect upon the child as well as upon the father's parenting ability." *R.H.* v. *B.F.*, 39 Mass. App. Ct. 29, 40 (1995). Second, "because [the judge] found the mother and the father to have equally flawed parenting abilities, the relationship between the father and the child and the child's preferences weighed the scales [excessively] in the father's favor." *Id.* at 41. And third, the Appeals Court ruled that the Probate Court failed to consider the special risks to the child in awarding custody to a father who had committed acts of violence against the mother. *Id.* at 40. An important theme of all these statements was that the Probate Court had failed to give sufficient weight to the effects of domestic violence on women and their children. *Id.* at 36-39.

The trial before the Probate Court lasted three days and produced a transcript of over 400 pages. Every aspect of the case that the two contesting parties argue to us now was thoroughly canvassed by numerous witnesses. The record leaves no room for doubt that Ross is a man with a poorly controlled temper, who at times threatened and inflicted violence on the mother. He has been a batterer. The Probate Court's findings clearly acknowledge that fact. The judge's findings also acknowledge the intimidation Ross imposed on John and Laura, the two older children in the household who were not Ross's children, and credit the testimony of Leslie's daughter that Ross engaged in conduct to her that can only be described as sexually abusive. These findings by the Probate Court are consistent with and indeed in some respects go beyond Leslie's proposed findings of fact and draw on the testimony at trial.

There are two sides to this sad story, and the Probate Court acknowledged both of them. There was testimony, which Leslie sought to put in context but did not deny, that she taunted and struck the father and hurt and humiliated him physically. Some, not all of these incidents might be explained away as defensive or retaliatory. The judge found that: "Neither party exercised such conduct that would make them eligible for any awards or accolades. . . . They both have been physically and emotionally abusive to each other. Their conduct can be described through their profanity, vulgarity, obscenity and nudity."

The mother's expert, Dr. Peter G. Jaffe, who is a specialist in matters relating to family violence and battered women's syndrome, casts all the incidents unfavorable to Leslie as manifestations of that syndrome. Leslie had been abused as a child and in the two marriages that preceded her relationship with Ross. The judge summarized Dr. Jaffe's judgments in his findings of fact, including Dr. Jaffe's statement that children who grow up in abusive households tend to repeat that pattern in their own relationships: "Dr. Jaffe feels that children who are witnesses to violence are also victims of violence. He expressed a concern that if [Vaughn] remained in his father's physical custody, it would reinforce the acceptability of the father's behavior to [Vaughn] which has the potential to make [Vaughn] a batterer himself in the future." The judge did not, however, make any findings of fact based on Dr.

Jaffe's testimony and did not say whether he considered Dr. Jaffe's testimony credible.

Rather the judge seemed moved to give particular weight to the recommendations and testimony of the guardian ad litem, Dr. Abruzzese, and less weight to the analysis and conclusions of Leslie's expert, Dr. Jaffe. Unquestionably Dr. Jaffe has impressive credentials, with very great experience in issues relating to family violence and battered women. But he was also an expert chosen by one of the parties in the context of this litigation.

Dr. Abruzzese, on the other hand, was an impartial witness whom the parties had consulted previously and who had been selected by their mutual agreement to serve as guardian ad litem. Like Dr. Jaffe, he has a doctorate in clinical psychology, though a much more recent one. His practice includes work with children, adolescents, and families.[10] Moreover he testified that both parents had had occasion some three years earlier to bring Vaughn to Dr. Abruzzese for advice about certain difficulties he was having at school. At that time he was working as director of adolescent and child services at the town's child services agency. Dr. Abruzzese had spent many hours with Vaughn, his parents, and others. He evaluated the family with a focus on the particular circumstances of this case and the needs of this child at this time. There is no doubt that Dr. Abruzzese was particularly moved by the love and attachment the father had for Vaughn, the attachment Vaughn seemed to have for his father, and by Vaughn's wish to spend more time with him and perhaps to have his primary base at his father's house. Certainly some of this affection came across as concern for his father's welfare, and as Dr. Jaffe pointed out, may for that reason be deemed an inap-

---

[10]The mother complains that it was wrong to give such weight to the guardian's judgments because he was not a specialist in family violence or battered women's syndrome. At trial the mother's counsel sought to emphasize this point by eliciting testimony regarding the unique characteristics of a family in which battering has taken place. Although Dr. Jaffe certainly contributed valuable insights to the proceedings, we would hesitate a long time before suggesting that in cases such as these, not only must both sides produce expert witnesses, but they must be experts in family violence. A qualified clinical psychologist with experience in family matters will, as Dr. Abruzzese indicated on cross-examination, have encountered this issue in his training and, unfortunately, all too frequently in his clinical practice. Dr. Abruzzese also stated that he believed that "family violence should be a factor in family litigation."

propriate role reversal and one that is encountered in families with a history of violence. Be that as it may, both the affection and the preference were clearly stated.[11] The judge was also moved by the fact that the boy appeared to be doing very well in his school work and that the father takes a great interest in his activities, meeting regularly with the boy's teachers. Finally, the Probate Court judge noted that the father, who had been a heavy drinker, had not used alcohol since 1985 and attends weekly sessions of Alcoholics Anonymous. The court also mandated that both parents should remain in therapy.

## III

We agree with the Appeals Court that the judge below "fail[ed] to make detailed and comprehensive findings of fact on the issues of domestic violence and its effect upon the child as well as upon the father's parenting ability." *R.H.* v. *B.F.*, 39 Mass. App. Ct. 29, 40 (1995). The Probate Court failed to consider the special risks to the child in awarding custody to a father who had committed acts of violence against the mother. *Id.* at 40. It is well documented that witnessing domestic violence, as well as being one of its victims, has a profound impact on children. See Note, Domestic Violence and Custody Litigation: The Need for Statutory Reform, 13 Hofstra L. Rev. 407, 417-422 (1985). There are significant reported psychological problems in children who witness domestic violence, especially during important developmental stages. See Cahn, Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions, 44 Vand. L. Rev. 1041 (1991).

Domestic violence is an issue too fundamental and frequently recurring to be dealt with only by implication. The very frequency of domestic violence in disputes about child custody may have the effect of inuring courts to it and thus minimizing its significance. Requiring the courts to make ex-

[11]Although the boy was described in testimony as "a really bright student," we note that the preference of an eleven-year-old is not given decisive weight, although it is a factor to be considered. See *Custody of a Minor*, 383 Mass. 595, 602 (1981); *Baird* v. *Attorney Gen.*, 371 Mass. 741, 753 (1977); *Bellotti* v. *Baird*, 443 U.S. 622 (1979); *Stone* v. *Duffy*, 219 Mass. 178, 182 (1914); *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 617 (1987).

plicit findings about the effect of the violence on the child and the appropriateness of the custody award in light of that effect will serve to keep these matters well in the foreground of the judges' thinking.

The Legislature reached a similar conclusion in respect to shared legal or physical custody. General Laws c. 208, § 31, provides that "[i]f, despite the prior or current issuance of a restraining order against one parent pursuant to chapter two hundred and nine A, the court orders shared legal or physical custody . . . the court shall provide written findings to support such shared custody order." A G. L. c. 209A order was outstanding in this case, and the judge made no explicit findings regarding the effect of shared custody on the child. We agree with the Appeals Court that such written findings should also be made attending specifically to the effects of domestic violence on the child and the appropriateness of the joint custody award in light of those effects. *R.H.* v. *B.F.*, 39 Mass. App. Ct. 29, 41 (1995).

Accordingly, we remand the case to the Probate Court for such explicit findings, both as we require in this decision and as we state are required by G. L. c. 208, § 31. We do not by this decision require the judge to hear further testimony if he does not consider that necessary, but at the least he must hear both parties and make explicit findings on the matters set out above.[12]

The case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*

---

[12]As almost three years have gone by since the Probate Court issued its judgment and Vaughn is now almost fourteen years of age, it may be appropriate for the judge to interview the child again as to his preference and for the judge to evaluate the success of the stipulated custody arrangement the parties have been living under in the interim.