NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-1075

ADOPTION OF OBADIAH (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees, issued by a Juvenile Court judge pursuant to G. L. c. 119, § 26, terminating the mother's rights to the two children.[2]  The mother argues that the judge failed to support his conclusions with "specific and detailed findings" as to domestic violence in the parents' relationship.  See Adoption of Hugo, 428 Mass. 219, 224 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).  The father argues that the judge should have stayed the termination decision to give the mother additional time to prove that her unfitness was temporary.  Because we conclude that the judge's decision was adequately supported by detailed findings

---

[1] Adoption of Amy.  The children's names are pseudonyms.
[2] The judge also terminated the father's parental rights to Obadiah.  Because the father was not named on Amy's birth certificate and had not been adjudicated her father, the judge terminated the parental rights of "any unknown or unnamed father."  The mother and father do not dispute that the father is Amy's father.  Neither the father nor the mother appeals the termination of the father's parental rights.

and that the judge was not required to delay termination, we affirm.

Background.  In order to address the mother's argument that the judge's written findings were inadequate, we begin with a summary of the relevant findings.

The parents' relationship began in 2015.  So, too, did the abuse.  By the end of the first year of the relationship, the mother had obtained her first abuse prevention order against the father.  By the end of the second year, the mother had obtained her second such order.  It was in the third year that the parents had their first child together, Obadiah.  Five months after Obadiah's birth, the mother fled Texas, where the parents had lived together, leaving the father behind.  She arrived in Boston with Obadiah on September 21, 2018.  A report pursuant to G. L. c. 119, § 51A (51A report), was filed that same day, alleging neglect by the mother.  The mother told the Department of Children and Families (department) that she believed the father had made the 51A report in retaliation for her desertion, that her relationship with the father had been mentally and physically abusive, and that she had moved to Boston because she was tired of fighting with the father.  She told the department that she was "fed up."

But the mother soon returned to the father.  From early in their relationship and through the end of 2018, the parents

2

moved extensively due at least in some measure to domestic violence:  from Florida, to Georgia, to South Carolina, and then to Texas.  Eventually the parents moved to Philadelphia to be closer to the father's family, and Amy was born in Philadelphia in July of 2019.  But the parents separated once again following an incident in December of 2019.  During an argument, the father had kicked a door of their residence off its hinges and, as a result, a police officer had to stand outside the home all night because there was no longer any door to secure the home.  That same month the mother left the father.  She and the two children returned to Boston, finding placement in a domestic violence shelter.  In January 2020, a 51A report alleging neglect by the mother was filed due to concerns of drug or alcohol abuse.  The department obtained emergency custody of the children, and in February they were temporarily placed with a maternal aunt.  The mother was permitted to stay with the maternal aunt and the children, subject to certain conditions.  During the investigation that followed the children's removal, the mother told the department that she was a victim of domestic violence. She told the department that she would never return to a relationship with the father.

Three months later, the mother returned to the father. Because the maternal aunt's child suffered from asthma, the mother was asked to stay home with the children to limit her

3

exposure to Covid-19 during the pandemic. Eventually, the mother was told that if she left the children and the maternal aunt's home again, she could not return. Despite the risk of losing this safe place to live, the mother decided to go out with her friends. The maternal aunt insisted the mother no longer stay with her.

The mother then returned to Philadelphia to be with the father; the children remained in the temporary custody of the maternal aunt. On July 21, 2020, the aunt relinquished custody of the children back to the department; she was worried after having learned that the mother had disclosed the aunt's address and her custody of the children to the father. The department placed the children in a foster home, in which the children remained at the time of trial. At the time of trial, the maternal aunt visited with them on a weekly basis but was not interested in adoption; the department was pursing the children's foster mother as their preadoptive resource.

In the months that followed her departure from the maternal aunt's home, the mother attended a virtual parenting class, and the mother and the father jointly completed a coparenting course that they mistakenly referred to as couples therapy.

The mother and the father were again briefly separated following an incident in August of 2020, when the father left the mother in Atlantic City, New Jersey, after an argument. The

4

mother testified that she was "jumped" by a group of women after the father left her. The mother returned to Massachusetts and attempted to secure a shelter placement. This placement was denied; the judge found that the mother had two previous evictions from shelters for combativeness and for providing a shelter's location to the father in violation of the shelter's rules.

After a week or two, the mother returned to the father. She told the department that she was living on her own in Philadelphia and was not in a relationship with the father. Based on this information, the department pursued a possible placement of the children with the mother but subsequently discovered that the mother continued to live with the father. The department provided the parents with an action plan, and the mother maintained contact with her department social worker while in Philadelphia. In May of 2021, the mother was evicted from the apartment she shared with father in Philadelphia after the parents obtained protection from abuse orders against each other in a Philadelphia court. Philadelphia police had been called to the residence thirteen times that year. The mother reported that the father had punched her, hit her, pulled her hair, dragged her on the floor, kicked down her bedroom door, and asked her for money and sex, at which point she "lost it" and attacked him. The father reported that mother had

5

previously punched him a few times and that she had thrown a glass plate at him out of anger, causing him an injury that required stitches.  Following the eviction, the mother moved back to Massachusetts and began living in a motel.  At the time of trial in July of 2021, the mother was residing in an extended stay hotel in Boston and had been separated from the father for two months, their longest period of separation.

The judge concluded that the mother and the father were unfit and that their unfitness was likely to continue into the indefinite future because of their extensive history of domestic violence, their inability to remain separate, their failure to demonstrate any benefit from services provided by the department, and the risk to the children of serious parental neglect.

Discussion.  To terminate parental rights, a judge must "make specific and detailed findings demonstrating that close attention has been given to the evidence."  Adoption of Hugo, 428 Mass. at 224.  "While subsidiary findings must be proved by a fair preponderance of the evidence, taken together these findings must prove parental unfitness, which is the 'critical inquiry,' by clear and convincing evidence."  Adoption of Leland, 65 Mass. App. Ct. 580, 583 (2006), quoting Care & Protection of Laura, 414 Mass. 788, 793 (1993).  Next, the judge must decide whether the "parent's unfitness is such that it

6

would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, 443 Mass. 512, 515 (2005).

The mother does not contend that any of the judge's factual findings are clearly erroneous but argues that the judge erred by failing to provide specific, detailed findings about six issues related to domestic violence in the parents' relationship. We address them in turn.

First, citing Commonwealth v. Goetzendanner, 42 Mass. App. Ct. 637, 643 (1997), the mother argues that the judge failed to consider evidence of battered women's syndrome (BWS). While evidence of BWS is admissible where relevant in proceedings like this, none was presented at least explicitly in terms of BWS below. The judge was not required to consider BWS sua sponte. To the extent the mother argues that a judge, in a decision concerning whether or not to terminate parental rights in a case involving domestic violence, must consider and address in specific written findings how he or she weighed the victimhood of the nonviolent parent and that parent's attempts, successful or otherwise, to escape that relationship, we think the judge's findings here were more than adequate. A determination by a judge that unfitness will continue into the indefinite future involves a predictive judgment. See Adoption of Carlos, 413 Mass. 339, 350 (1992). Here, the judge's conclusion that the

7

mother was likely to repeat her pattern of returning to the father was fully supported by the evidence.

Second, the mother argues that the judge's findings failed to credit the mother's efforts to leave the father. We disagree. The judge's findings sufficiently chronicle the mother's failed attempts to terminate her relationship with the father: from her claim in 2018 that she was "fed up" with the father, to her claim that she never wanted to be in a relationship with the father again following their separation in 2019, to her claim that she was no longer living with the father following the Atlantic City incident, to her claim at trial that "this time was different." The judge addressed these efforts directly, finding that the mother's claim that "this time was different" was not credible because before returning to the father "[e]ach time [the m]other has stated she was done with the f]ather for good, no longer in a relationship, and she would not go back," and there was "no credible evidence presented to suggest that this would change in the future." The judge's findings were not deficient as to their description of the mother's failed attempts to leave the father.

Third, the mother argues that the judge failed to consider that her attempts to escape the father were repeatedly foiled by a lack of financial resources. However, the judge specifically found that the mother left a safe place with the children in

8

April 2020 because she would not stop socializing during the pandemic's first peak, bringing risk to the maternal aunt's family.  The mother's return at that time to the father cannot be said to be based on having nowhere else to go.  Moreover, the judge did address the mother's lack of resources, finding that the mother "explained [that] she previously went back to [the f]ather because she did not have emotional or financial supports" and that at trial the mother "still [wa]s unable to identify supports in Massachusetts."  The judge was entitled to consider the impact that the mother's lack of supports and her unstable home life had on the children.  The judge found no reason to believe anything was different and properly addressed the reasons behind the mother's inability to leave the father.

Fourth, the mother argues that the judge ignored testimony that it takes seven attempts for the victim of domestic violence to escape her abuser.  No expert testified to this statistic. The mother testified that her counsellor told her this.  While the mother argues that this statistic also came from the department's social worker, the social worker testified on cross-examination that she did not know there was a number and had only heard about a number from the mother's therapist. Regardless, the judge did not err in terminating the mother's parental rights where he found that the mother had continued to place her relationship with an abuser before the protection of

9

the children, failed to demonstrate any improvement in that relationship over the course of five years of domestic violence, and failed to "recognize[] the impact of domestic violence on [the children] when they were in the home."  The mother was on her fourth attempt at separation in six years.  Having observed no improvement from the mother, the judge was not required to wait some indeterminate period of time for the mother to exhaust a hypothesized final three attempts before terminating her parental rights.  Of course we recognize the difficult circumstances that may face victims of domestic violence.  But in proceedings relating to parental fitness, the "paramount duty of courts is to consult the welfare of the child" (citation omitted).  Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 588 (1981).

Fifth, the mother argues that the judge failed to consider her participation in counselling and action plan tasks.  But the judge specifically found that neither parent had "demonstrated any benefit from their engagement in these services," noting that despite such engagement the mother continued her relationship with the father and returned to the father after he abandoned her in Atlantic City.

Sixth, the mother argues that the judge failed to make specific and detailed findings as to how the domestic violence in the mother's relationship negatively impacted the children.

10

"Requiring the courts to make explicit findings about the effect of the violence on the child and the appropriateness of the custody award in light of that effect will serve to keep these matters well in the foreground of the judges' thinking." Custody of Vaughn, 422 Mass. 590, 599-600 (1996). Here, the negative impact on the children was adequately captured by the judge's findings. The judge found that the children were exposed to domestic violence on two occasions. First, the judge found that the mother and father had an altercation in a car, with both children present. Second, the judge found that the children were present when the father kicked the door to the apartment off its hinges. The mother and children were then forced to spend the night in an apartment without a door, with a police officer guarding the entrance to their home. "It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children." Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017), quoting Custody of Vaughn, supra at 595. The judge also found that, because of the domestic violence, the children were constantly forced to move to new States. Additionally, the judge's finding that neither parent appreciated the impact of domestic violence on the children supports his conclusion that return of the children to the mother would place the children at risk of continued

11

neglect.  The judge sufficiently documented the impact of domestic violence on the children.

Finally, the mother relies on Adoption of Imelda, 72 Mass. App. Ct. 354, 363 (2008), throughout her argument, suggesting that she should not be found unfit where the mother in Imelda was not found to be unfit.  Imelda is not applicable here.  In Imelda, the court vacated the termination decree and remanded to the Juvenile Court for further proceedings after concluding that the trial judge had failed to make findings as to concerns of domestic violence in the adoptive home, failed to grant a continuance where the mother lacked representation during the best interests portion of the trial, and failed to consider whether the mother would be likely to improve in the future -- instead relying on the mother's absence from trial and her failure to comply with the department's service plans.  See id. at 366-367.  Here there were no concerns as to domestic violence in the adoptive home, there were no issues as to legal representation, and the judge directly addressed whether the mother was likely to improve based on her history and inability to separate from the father.

The judge's conclusion that the mother's inability to benefit from services and separate from the father rendered her unfitness likely to continue into the indefinite future was supported by specific and detailed findings.

The father does not appeal the termination of his own parental rights and argues only that the judge should have allowed the mother additional time to demonstrate that her unfitness was only temporary. As a preliminary matter, we may "decline to address allegations of error raised by the father having relevance only to the fitness of the mother." Adoption of Paula, 420 Mass. 716, 723 n.8 (1995). In any event, the father's argument is without merit.

Quoting L.L. v. Commonwealth, the father argues that the judge's decision was an abuse of discretion because a delay of termination was within the range of reasonable alternatives. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) ("Borrowing from other courts, we think it more accurate to say that a judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made 'a clear error of judgment in weighing' the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" [citation omitted]). The father's argument reverses the standard. The father's burden was not merely to show that a delay was within the range of reasonable alternatives, but rather to show that the judge's decision was not. As the language of L.L. spells out, the grant of discretion to the lower court anticipates that in any case there may exist more than one outcome deserving affirmance by this

13

court.  Even assuming that a delay was within the range of reasonable alternatives, that would not require the conclusion that the judge's decision, forgoing such a delay, fell outside the range.

Here, the judge's decision was not an abuse of discretion. As detailed above, it was adequately supported by his findings that the mother had failed to show improvement in the ways described above over the course of the case, continued to choose the father over the children, and traded the opportunity to live a stable life with the children in April of 2020 for a chance to go out with her friends.

The father argues that this court should reverse because waiting six months is a small sacrifice when compared to the permanence of termination.  Discretion is afforded to trial judges specifically because they are tasked with engaging in a difficult, fact-dependent analysis that the father would have this court undertake instead.  Nothing in the record provides this court with the basis to undo the judge's determination that the children had waited long enough.  Indeed, the children had waited their entire lives for the mother to separate from the father.  As such, the judge's refusal to delay termination did not constitute an abuse of discretion.  See Adoption of Xarina,

14

93 Mass. App. Ct. 800, 803 (2018) ("it is unfair to leave a child in limbo indefinitely").

Decrees affirmed.

By the Court (Rubin, Shin & Ditkoff, JJ.[3]),

*Joseph F. Stanton*

Clerk

Entered:  February 13, 2023.

---

[3] The panelists are listed in order of seniority.