NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1504

ADOPTION OF KATORI.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found the mother and the father unfit to parent their child and terminated their parental rights to their daughter, Katori.[1]  On appeal, the mother and the father separately challenge the judge's finding of parental unfitness, contending that it is not supported by clear and convincing evidence.  The mother also argues that the judge erred in concluding that the Department of Children and Families ("the department" or "DCF") made reasonable efforts to reunify her and the child.  She also argues that the judge relied on stale information, failing to consider the positive steps she had taken to address her deficiencies as a parent. The father argues that the judge erred in admitting certain

---

[1] A pseudonym.

hearsay statements included in documentary evidence while unfairly denying his rebuttal evidence. The father also takes issue with the judge's reliance on a criminal charge in which the father was found not guilty and on an open criminal charge relating to a charge of witness intimidation. We affirm.

Background. We recount the relevant facts from the judge's well-documented and thoughtful findings, reserving certain details for later discussion. The mother has six children; she shares three daughters with the father, including Katori. The father has five children, including the three he shares with the mother. Both the mother and the father have a long history with the department prior to the birth of Katori, who was born on February 9, 2020 and was removed from their custody two days after her birth.[2] The mother's and the father's parental rights have been terminated as to two of the three children they share. The mother's parental rights have also been terminated as to one of her older children such that she has custody of only one daughter. The father's parental rights also have been terminated as to his daughter from another relationship (Katori's half-sister); he has custody of none of his children.

---

[2] Both parents had been involved with the department years before they met one another; father had supported allegations of physical abuse of his oldest child and mother had supported allegations of neglect of three of her children.

Both the mother and the father suffer from mental health issues, and each has a history of substance misuse. The mother has been diagnosed with posttraumatic stress disorder (PTSD), anxiety, depression, and borderline personality disorder. In the past the mother has been addicted to cocaine and admitted to using cocaine while pregnant with her older daughter, and later became addicted to Adderall and Klonopin. The father reported being diagnosed with attention deficit disorder (ADD), attention deficit hyperactivity disorder (ADHD), bipolar disorder, mild Tourette's Syndrome, depression, and anxiety. The father also has a history of housing instability and has not been employed full time since 2010. The father has admitted to a history of cocaine and alcohol use, but denies alcohol abuse.

The mother and the father dated in 2014, separated in 2015, and then reunited and married in 2016. Their relationship was marred by domestic violence and turmoil. There also is a history of domestic violence in the mother's past relationships. The father denied being physically abusive to the mother but did admit to being verbally and mentally abusive.

As a couple, the parents have been the subject of numerous reports alleging neglect and abuse under G. L. c. 119, § 51A ("51A reports") and investigations under G. L. c. 119, § 51B ("51B reports). In 2014, allegations of neglect of the mother's three children were supported when the mother left the children

3

with her parents and, by doing so, exposed them to domestic violence. In 2017, allegations of neglect were supported when the mother approached one of the children as if to strike her, and the child fell off the bed and was injured.

In June and July of 2018, a series of 51A reports were filed alleging physical abuse by the father and neglect by the mother of the mother and father's two daughters and the father's daughter, Katori's half-sister. Videotape depicted the father choking, punching, and knocking down the half-sister and threatening her and the mother. Another videotape depicted the father choking the mother and banging her head against the wall in the presence of several of the children.[3]

In addition, a July 2018 51A report alleged that the half-sister had revealed that the mother had punched the half-sister on her thighs and arms, leaving bruises; pushed her into furniture; and that the half sister had witnessed the mother hitting other half-siblings and the family dog. It also alleged that the half-sister had made suicidal statements to the father, who never took steps to have her evaluated by appropriate crisis professionals. Ultimately, the father was charged criminally with assault and battery when the half-sister disclosed that the

---

[3] In one of the 51A reports, the mother admitted to the social worker that the father had choked the half-sister.

father had punched, slapped, and pushed her head into a refrigerator, and that she required staples to stop the bleeding. He was later acquitted.

The children were removed from the home on June 21, 2018. The department remained involved with the mother and the father throughout 2019, investigating abuse and neglect allegations as well as implementing action plans to assist the family. In April of 2022, however, the mother and father's parental rights of the two other children they shared were terminated.

Two days after Katori's birth, a 51A report was filed alleging that the child was at risk of neglect and physical abuse. The department investigated and found that although Katori had been in the home for only three hours, she smelled severely like smoke and urine, and a dirty pack and play that was filled with clothes, belts, tools, and other unsafe items was the planned sleeping location for Katori. The department supported allegations of neglect by the mother and the father due to the significant history of allegations of abuse, neglect, and domestic violence, and removed Katori from the home. Although the initial plan was for permanency through reunification, the goal later changed to adoption.

Trial occurred on January 10, 2023, and continued for six non-consecutive days concluding on April 13, 2023. The trial judge heard from seven witnesses and 108 exhibits were

introduced into evidence.  In a detailed written decision, the judge made 291 findings of fact and 45 conclusions of law, finding that the parents had not meaningfully participated in their action plans or otherwise addressed their histories of substance misuse, domestic violence, and abuse and neglect of their older children such that the judge could conclude that they would provide acceptable care for Katori.  The judge found that the parents failed to demonstrate improved parenting skills or an understanding of the potential impacts of domestic violence on Katori should she be returned to them.  The judge concluded that the mother and the father were unfit and that the child's best interests were served by the termination of parental rights.

Discussion.  1.  Standard of review.  "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'"  Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).  The department bears the burden of proof as to both unfitness and the child's best interests.  See Care & Protection of Erin, 443 Mass. 567, 571 (2005).  "While a decision of unfitness must be supported by clear and convincing evidence, . . . a judge's findings will be disturbed only if they are clearly erroneous."

6

Adoption of Paula, 420 Mass. 716, 729 (1995). "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Adoption of Rhona, 57 Mass. App. Ct. 479, 482 (2003).

2. Unfitness and termination of parental rights. The mother and the father each challenge the judge's determination of unfitness. Parental unfitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). "It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children, . . . and instances of such familial violence are compelling evidence for a finding of parental unfitness." Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017), quoting Custody of Vaughn, 422 Mass. 590, 595 (1996). "A judge may properly consider a parent's decision to remain in a relationship with an abusive partner in determining parental fitness." Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021).

We need not detail the parents' failings and actions set forth at length in the judge's comprehensive findings of facts. The evidence more than supported findings of unfitness of both

7

the mother and the father as both had issues with untreated substance misuse, mental health, and domestic violence. The trial judge carefully considered and chronicled the long history of domestic violence between the mother and the father, and that at times the violence extended to the older children. The trial evidence included a videotape of violent physical abuse of Katori's half-sister by the father while the mother was present but did not intervene. It also included two videotapes in which the father violently assaulted the mother in the presence of the children as well as other documented reports of physical abuse and neglect of the children. It was appropriate for the judge to consider the evidence of a decade's worth of abuse that occurred in the family when determining parental fitness. "[P]hysical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm." Adoption of Garret, 92 Mass. App. Ct.664, 671 (2018), quoting Custody of Vaughn, 422 Mass. 590, 595 (1996). Further, the judge found that "neither [the mother or the father] have demonstrated any understanding of how their perpetuation of a chaotic household filled with dysfunction and domestic violence impacted their older children and would impact [Katori] should she be returned to their care."

As to the father's unfitness, the evidence of abuse in the records and depicted in the videotape evidence amply supported the judge's findings that the father physically abused the mother and the half-sister. Although the father offered explanations that he grabbed the mother by the neck because she was attempting to swallow a large amount of pills and that his grabbing of the half-sister was play fighting rather than real violence, the judge was not required to credit these explanations. Nor was the judge required to accept the father's explanation that, on a different occasion, he did not punch the half-sister and bang her head into the refrigerator but rather that the child slipped in the kitchen and accidentally hit her head. And, although the mother denied that the father was physically violent towards her or the children, the judge "was not obliged to believe the mother's testimony" (citation omitted). Custody of Eleanor, 414 Mass. 795, 800 (1993). The judge made numerous findings, none of which are contested, describing an environment in which the father was physically and verbally abusive to the mother and both the mother and the father were physically and verbally abusive to, and neglectful of their children. The father failed to meaningfully engage in the department's plan to address his deficiencies. For example, he refused engage in a substance misuse program, and, since 2021, has failed to engage with an individual counselor. The

9

father first admitted and then later denied being physically abusive to the mother and the children and engaged in domestic violence programming only geared toward being a victim and not a perpetrator of domestic violence. At times, the father refused to allow the department to conduct home visits, failed to gain insight into his behaviors after attending a father's group, and failed to have meaningful interaction with Katori during supervised visitation.

The mother claims that, while she may have had shortcomings, the judge failed to consider her current fitness and instead relied upon past incidents of neglect and abuse. Specifically, the mother argues that instead of basing a decision based upon the significant changes she had made in her life, the judge ignored or did not properly consider her sobriety, stable employment, and engagement in domestic violence programming. We disagree, as many of the mother's arguments "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses." Adoption of Don, 435 Mass. 158, 166 (2001). Contrary to the mother's claim, the judge did not ignore evidence favorable to the mother. The judge acknowledged that the mother had engaged in some treatment and that she was now employed full-time. The judge also credited the mother with being "overall consistent" in her attendance at visits with

10

Katori. However, despite a self-reported sobriety date of 2019, the mother did not provide drug screens or prepare a relapse prevention plan to support her claim of sobriety. Moreover, while the mother had participated in individual therapy until 2021, she had not reengaged in therapy despite a referral by the department. The judge did fairly consider what the mother had accomplished, but, "[e]ven where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) (parent's failure to benefit from services "relevant to the determination of unfitness" [citation omitted]). In making the determination of unfitness, the judge did not err in concluding that the mother's failure to engage in and complete treatment for the very issues that resulted in her separation from her child (domestic violence, substance misuse, lack of parenting skills, untreated mental health) supported the conclusion that the Katori would be subject to abuse and neglect if she were reunited with the mother.

In short, both parents had significant shortcomings, and neither parent took sufficient steps to change their behavior. The evidence was clear and convincing and amply supported the

judge's determination that both the mother and the father were unfit to parent Katori and that their unfitness was not temporary.

3. Reasonable efforts. For the first time on appeal, the mother claims that the department failed to take reasonable steps to reunify her with Katori. "Before seeking to terminate parental rights, [the department] must make 'reasonable efforts' aimed at restoring the child to the care of the . . . parents" (citation omitted). Adoption of Uday, 91 Mass. App. Ct. 51, 53 (2017). A judge's decision that the department has made reasonable efforts will not be overturned unless it is clearly erroneous. Adoption of Ilona, 459 Mass. at 62. "It is well-established that a parent must raise a claim of inadequate services in a timely manner." Adoption of West, 97 Mass. App. Ct. 238, 242 (2020), quoting Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), S.C., 460 Mass. 72 (2011). The time to make such a claim is either when the parenting plan is adopted or when the parent receives the services. See Adoption of West, supra.

The mother did not raise her claim of inadequate services in a timely fashion as she had filed a "no reasonable efforts" motion in the trial court but withdrew it just two weeks later. However, even if the claim had been preserved, the claim must fail on the facts of this case. Here, the department created

12

six separate action plans designed to facilitate the mother in changing her approach to parenting her child, including addressing the pattern of domestic abuse she had suffered and appreciating its harmful impact on her children. The mother has failed to articulate how, even though she did not avail herself of most of the services offered, the department has failed to provide reasonable efforts at reunification.[4] In short, there was no error in the judge's determination that the department made reasonable efforts.

4. Evidentiary rulings. The father contends that the judge erred in admitting multilevel hearsay contained in the department's report relating to the abuse of Katori's half-sister. At trial, the department introduced a DCF report in which half-sister admitted that she lied at the father's criminal trial when she testified that the father did not hit her. In the report, the half-sister confirms that the father had in fact hit her but that the father had threatened to reduce his visitation time with her if she did not testify at trial that the two were play-fighting. The father's trial counsel attempted to introduce the trial transcript of the criminal

---

[4] To the extent that mother suggests that the department acted too quickly in removing Katori without making "reasonable efforts" to keep mother and child together, this issue is not properly before us as it was not raised at the emergency removal hearing.

trial in which the half-sister testified that the father did not abuse her.  The trial judge denied the admission of this evidence, but specifically told counsel that the evidence could be admitted if the half-sister was called to testify.  The hearsay statement contained in the DCF report was admissible because the hearsay statement was from a person who was both identified and available for cross-examination.  See Adoption of Luc, 484 Mass. at 152.  The trial judge properly admitted the hearsay evidence and then guided counsel for the father how to properly introduce the evidence that half-sister had testified at a criminal proceeding that the father had not assault her.  The judge was correct in ruling that the trial transcripts from the criminal trial were not admissible to rebut the DCF report, but that the testimony was admissible if counsel called the half-sister to testify.  The father chose not to call the half-sister and cannot now complain about his trial strategy.  To the extent that the father claims that the Supreme Judicial Court, in Adoption of Luc, supra, improperly shifted the burden of proof from the department to the parents by allowing the department to engage in an unchecked "document dump," we are unpersuaded.

5.  Criminal history of the father.  Finally, the father claims that the trial judge erred in (1) relying on criminal charges that he assaulted the half-sister because he was found

14

not guilty of those charges, and (2) relying on open charges of intimidation of a witness because the judge mistakenly believed the charge involved intimidation of the half-sister.

First, the father has offered no relevant caselaw to support his position that a finding of not guilty in a criminal trial requires a judge to ignore the underlying factual evidence that may be relevant to a determination of parental fitness. In fact, the cases cited by the father are inapposite. See Care & Protection of Frank, 409 Mass. 492, 494 (1991) (testimony of a police officer and a police report detailing observations of mother's conduct properly admitted even though one of two criminal charges was dismissed). In Care & Protection of Frank, supra at 496, the mother also objected to the admission of a police report describing her as intoxicated and boisterous, and describing the apartment as 'a complete mess,' because the report constituted "evidence of criminal conduct" used to prove the mother's unfitness. The Supreme Judicial Court disagreed. Even if the police report contained evidence of uncharged criminal conduct, the court decided that it was still admissible because it contained personal observations by a police officer relevant to the mother's parental fitness. Id. at 497-498. In sum, our cases do not prohibit a judge from assessing underlying conduct that forms the basis of a criminal prosecution if it bears on the determination of fitness. Furthermore, given the

15

multitude of factors the judge considered when determining the father's ability to parent his child, the father's single criminal charge did not play a prominent factor in the analysis.

Lastly, the father argues that the judge erred in finding that, at the time of trial, the father had an open charge of intimidating half-sister by pressuring her to lie at his criminal trial. In fact, the open intimidation of a witness charge was not related to half-sister and this one particular finding of fact is in error. However, this one error does not result in the nullification of 290 other findings of fact which were properly found by the judge. In particular, the judge credited evidence that the father had intimidated the half-sister to lie at his criminal trial, and that half-sister later recanted this testimony and again asserted that the father had physically abused her and threatened her. The judge's fleeting reference to an open charge of witness intimidation and mistaken

16

connection to the half-sister, when considered in light of all of the factual findings, was harmless.

Decrees affirmed.

By the Court (Meade, Walsh & Smyth, JJ.[5]),

Clerk

Entered: December 11, 2024.

---

[5] The panelists are listed in order of seniority.