NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-755

ADOPTION OF HALEA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from decrees issued by a judge of the Juvenile Court following a trial finding the father unfit to parent his children, Halea and Lacey, and terminating his parental rights pursuant to G. L. c. 210, § 3.[2]  We affirm.

Background.  We summarize the trial judge's findings of fact, supplemented by uncontroverted evidence from the record, and reserve certain facts for later discussion.

The Department of Children and Families (department) has been involved with the family since Halea's birth in 2016.  The father has a long history of domestic violence and has been

_____

[1] Adoption of Lacey.  The children's names are pseudonyms.

[2] The mother entered into a stipulation terminating her parental rights and is not a party to this appeal.

diagnosed with a delusional disorder. In 2016, the father was arrested for assault and battery against the mother, an incident for which Halea was present. In May 2018, police responded to an incident involving an argument between the parents in front of the children, and the mother smashing the windshield of the father's car. When the police told the father that they were arresting the mother and asked him if he could care for the children, he replied that he could not. On September 15, 2018, police responded to a domestic violence altercation between the parents at which the children were present.

On August 1, 2022, just one month before trial commenced, officers were dispatched to perform "a wellbeing check" and found the father asleep in a vehicle that was "in drive and running, sitting at a green light." The father became "irate and argumentative" after the officer told him that the vehicle would have to be towed because the insurance had been revoked. The father clenched his right hand, took a "fighting stance," and walked toward the officer shouting profanities and threatening to beat up the officer. When the officer attempted to place the father under arrest, the father struggled, resisted, and got into a physical altercation with the officers, injuring one of them.

On September 17, 2018, the department filed the present care and protection petition pursuant to G. L. c. 119, § 24, and the children were placed in the department's custody where they remained at the time of trial.

The father started attending a domestic violence group, a task on his department action plan, but stopped after ten sessions. Because the father denied having any issues with domestic violence, the department agreed that the father could instead participate in an anger management program. At the time of trial, the father had completed two anger management classes.

The father consistently visited with the children from 2018 until the end of 2019. After that, the father did not visit the children for over two years. When COVID-19 restrictions were in place, the father was offered video visits but did not participate in any.

Lacey was four years old, and Halea was six, at the time of trial. The children are placed with a family member, who is their foster parent and proposed preadoptive parent. Both children have been diagnosed with developmental delays. Lacey has been diagnosed with autism. The foster parent facilitates Lacey's participation in Applied Analysis services. There are concerns that Halea is autistic, but she has not yet been diagnosed. Both children have individualized education plans in

3

school to address their developmental delays.  The foster parent
has advocated for the services and ensures that the children
consistently receive them.  She also works with service
providers to develop strategies to respond to the children's
behavioral challenges.

Discussion. 1. The judge's comments during trial.  The
father contends that the judge made comments during trial
suggesting that she had improperly prejudged the case.  After
the children's cross-examination of the department's second
witness, the judge stated:

> "I do want to say prior to beginning the case today, I did
> have an opportunity to review all of the exhibits that were
> uploaded . . . .  Considering those exhibits . . . , as
> well as the testimony so far, I would encourage people to
> use the lunchbreak to reconsider the agreements that have
> been proposed."

The father did not object to the comments at trial, did not
move for a mistrial, and did not ask the judge to recuse
herself.  Because the issue was not properly raised in the trial
court, it is waived, and we decline to address it.  See Adoption
of Leland, 65 Mass. App. Ct. 580, 588 (2006).

2. The evidence at trial.  The father also argues that the
judge's findings were tainted by her prejudgment of the case and
that the evidence did not demonstrate that he would likely
remain unfit for the foreseeable future.  We are not persuaded.

4

On review, "we must determine whether the trial judge abused [her] discretion or committed a clear error of law." Adoption of Elena, 446 Mass. 24, 30 (2006). The judge's fitness determination must be supported by "specific and detailed" findings that demonstrate parental unfitness by clear and convincing evidence. Custody of Eleanor, 414 Mass. 795, 799 (1993). "We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of the evidence." Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011).

"In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). Recognizing that termination of parental rights is an "extreme step, a judge must decide both whether the parent is currently unfit and whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (quotations and citations omitted). Id.

The evidence supported the judge's conclusion that the father's unfitness was not temporary and was likely to continue indefinitely. See Adoption of Ilona, 459 Mass at 59-60

5

("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period.") During the four years that the case had been pending, the father failed to consistently engage in services. He stopped attending a domestic violence class and did not consistently attend therapy. In 2018, the father refused to work with the department because he felt the social workers and others in the department were "trying to set him up or keep him away from his family." He demonstrated an unwillingness to address domestic violence and mental health concerns and an unwillingness to reengage in therapeutic services. The father did not think he needed parent education because he believed he was an "excellent parent."

The father's extensive history of unacknowledged and unaddressed domestic violence is further evidence that the father's unfitness was not temporary. Children exposed to domestic violence "suffer[ ] a distinctly grievous kind of harm" that is relevant to parental fitness. Custody of Vaughn, 422 Mass. 590, 595 (1996). Although the father now concedes that he had a "serious history of domestic violence," he contends that the issue is stale because the last domestic violence incident with the mother took place three years before the trial. We are not persuaded. As noted supra, the father and mother had a

6

relationship characterized by domestic violence.  This violence continued after the children were removed from their care.  In May 2019, police officers responded to a call from the mother.  When they arrived, they saw the father holding the mother down on the ground.  The mother told the police that the father choked her and poured chemicals all over her.

The father's domestic violence issues were longstanding and predated his relationship with the mother, characterizing his previous relationships.  Dating back to February 1999, the father perpetrated numerous acts of domestic violence against two prior girlfriends which were the basis for criminal charges and allegations including rape, domestic abuse, threats, and violation of G. L. c. 209A restraining orders.  Despite his extensive history of domestic violence, including six restraining orders issued against him, the father denied engaging in any domestic violence and testified that he "knew [he] didn't need" services for domestic violence.

The evidence supported the judge's finding that the father failed to productively engage in services.  Despite the father's participation in two anger management classes, he continued to display volatile behavior.  The record supported the judge's finding that the father's "inability to manage his anger persists, as evidenced by his arrest" for charges including

7

threats, resisting arrest, assault and battery on a police officer, and assault by means of a dangerous weapon "just a month before trial commenced."  "Even if a parent engages in some of the services offered by the department, mere participation in the services does not render a parent fit without evidence of appreciable improvement in [the parent's] ability to meet the needs of the child[ren]" (quotations and citations omitted).  Adoption of Breck, 105 Mass. App. Ct. 652, 660 (2025).

The father failed to consistently visit the children during the four years the case was pending, allowing two years to pass without seeing his children at all.  He blamed the department for his lack of visits even though the department attempted to contact him and engage him.  He only resumed visits five months before trial commenced.  See Adoption of Darla, 56 Mass. App. Ct. 519, 522 (2002) (failure to visit child supports finding of parental unfitness).  The children have exhibited emotional dysregulation following the visits.  When they asked the father if they could call him by his first name, he started calling Halea by different names, causing her to become upset.  The evidence supported the judge's finding that the father declined the opportunity to have visits facilitated by a program that provided additional supervised parent-child visits and parenting

8

education.  At the intake for the program, the father stated that he did not feel he needed supervision or education.

The evidence supported the judge's finding that the children "require a structured, child-centered environment where their basic needs and special needs are consistently anticipated and met without fail."  As the judge found, the children's special needs "require consistent engagement in necessary services, as well as monitoring for possible future services."  The father argues that the judge erred by finding that he did not have the necessary skills to address the children's special needs and that he should not have been "faulted . . . for lacking those skills" where the department "had not offered the father any specialized training to address his daughter[s]' needs."  The judge did not err.  The father had not parented the children in four years and the judge found that he could not explain his understanding of what autism is and what it requires.  See Adoption of Jacques, 82 Mass. App. Ct. 601, 608-609 (2012) (sufficient nexus between shortcomings and ability to care for child's special needs where parent exhibited limited understanding of child's diagnoses and had not parented child in five years); Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 125 (1984) ("The specialized needs of a particular child when combined with

9

the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness"). Furthermore, "[a] parent cannot raise a claim of inadequate services for the first time on appeal." Adoption of West, 97 Mass. App. Ct. 238, 242 (2020). See id. ("Raising the issue at an early stage in the proceedings allows the department to remedy the inadequate services").

The father also contends that the judge's findings ignored evidence favorable to him. This argument lacks merit. The judge's findings acknowledged evidence favorable to the father including the father's participation in anger management classes, a parenting assessment, a psychological evaluation, and a "Fathers in Trust" program. However, the judge properly concluded that this favorable evidence was undermined by the father's failure to take responsibility for his actions and persisting violent behavior. See Adoption of Jacques, 82 Mass. App. Ct. at 608 ("[T]he judge was entitled to consider the evidence of [the father's] recent improvements within the context of [his] earlier and continuing deficits"). Although the judge did not specifically find all the favorable facts the father raises in his brief, she was not required to make specific findings about every piece of evidence presented where the evidence of unfitness, for the reasons discussed above, was

overwhelming.  See Adoption of Franklin, 99 Mass. App. Ct. 787, 799 (2021).

The father argues that numerous findings of the judge are "not factual findings but statements of opinion without the necessary factual analysis of the trial record to support them." It is true that the judge's finding that the "father's delusional disorder heightened his anxiety about the mother's late return home" does not appear to be supported by evidence in the record.  However, the error was harmless in light of the overwhelming evidence of his unfitness.  See Adoption of Peggy, 436 Mass. 690, 702 (2002).  See also Adoption of Franklin, supra.  We agree with the father that some of the statements in the judge's "findings of fact" section appear to be legal conclusions, but those conclusions are supported by clear and convincing evidence and we discern no error of law or abuse of discretion.  See Adoption of Luc, 484 Mass. 139, 144 (2020); Custody of Eleanor, 414 Mass. at 799.

The remainder of the father's arguments "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses."  Adoption of Don, 435 Mass. 158, 166-167 (2001).  The father testified at trial, and the judge was able to assess his credibility.  She found that some of his answers "simply did not make logical

11

sense" and that he "refused to answer questions that might have cast him in a negative light." "[T]he judge's assessment of the credibility of the witnesses and the weight of the evidence is entitled to deference." Adoption of Elena, 446 Mass. at 31. Accordingly, we do not disturb the judge's "specific and detailed [findings] . . . demonstrat[ing] that close attention was given to the evidence." Adoption of Georgia, 433 Mass. 62, 66 (2000).

Conclusion. We conclude that the judge did not abuse her discretion or commit a clear error of law in determining that the father was unfit, that his unfitness was not temporary, and that termination of his parental rights served the children's best interests.

Decrees affirmed.

By the Court (Blake, C.J.,
Meade & Tan, JJ.[3]),

Paul Little

Clerk

Entered: February 26, 2026.

---

[3] The panelists are listed in order of seniority.

12